STATE of Iowa, Appellee,

v.

Jerry Dean RUPP, Appellant.

No. 62194.

Supreme Court of Iowa.

Aug. 29, 1979.

Richard G. Davidson, of Davidson & Hemphill, Clarinda, for appellant.

Thomas J. Miller, Atty. Gen., Selwyn L. Dallyn, Asst. Atty. Gen., and Gary Gee, County Atty., for appellee.

Considered by LeGRAND, P. J., and REES, HARRIS, ALLBEE, and McGIVE-RIN, JJ.

LeGRAND, Justice.

This is an appeal from sentences on two guilty verdicts. The cases were tried together under separate counts of the same information. One was a charge of assault with intent to commit murder (§ 707.11, Iowa Criminal Code) and the other was possession of firearms by a felon (§ 724.26, Iowa Criminal Code). We reverse on the former and affirm on the latter.

The events in question started with a drinking party at a tavern known as the Hi-Lo Lodge. An argument ensued between Curtis Sederburg and a third party, Bud Wolf, concerning change for a $10.00 bill in connection with paying off a bet. Defendant became embroiled in the dispute, which continued outside after the parties left the Hi-Lo.

The argument became more and more heated. The record is in dispute as to who was the aggressor. Eventually Sederburg started toward defendant, who produced a .38 caliber revolver and shot him. Defendant fled the scene and was later arrested at his home.

The two charges described above resulted. We discuss them separately, and we deal first with the assault.

I. ASSAULT WITH INTENTION TO COMMIT MURDER.

Defendant raises numerous objections to the instructions. He also requested his own instructions on almost every material issue. The trial judge rejected them all but gave the substance of most in his own language. We have said a trial court is free to phrase instructions in its own words as long as the instructions given fully and fairly advise the jury of the issues they are to decide and the law which is applicable. *State v. Millspaugh*, 257 N.W.2d 513, 515 (Iowa 1977).

We believe these instructions did that except on the issue of justification. The error there was both serious and prejudicial. It necessitates a reversal and a new trial.

Defendant admitted he shot Sederburg. He claimed he was justified. As applicable in this case, justification—or self-defense—is a doctrine of the law permitting one, under certain circumstances, to use force in defending himself. *See* ch. 704, Iowa Criminal Code. The force used must be reasonable; and force should be resorted to at all only as a last resort.

We set out the relevant part of the applicable statute:

704.1 *"Reasonable force"* is that force which a reasonable person, in like circumstances, would judge to be necessary to

prevent an injury or loss, and no more, except that the use of deadly force against another is reasonable only to resist a like force or threat. *Reasonable force, including deadly force, may be used even if an alternative course of action is available if the alternative entails a risk to one's life or safety,* . . . . (Emphasis added)

■ The problem in this case arises because of the italicized portion of the statute, which recognizes there may be circumstances when the attempt to take an alternative course of action will pose a serious threat to one's safety. In such a situation a party may use reasonable force, including deadly force, *without* first taking an available alternative course. *See* § 704.2(3), Iowa Criminal Code, for definition of "deadly force" as applicable here.

■ Defendant claimed he was in reasonable fear that Sederburg intended to do him serious injury. He gave detailed testimony of bad blood between them, of several prior assaults by Sederburg, and of Sederburg's threats to kill him.

He insisted he was justified in shooting without first taking an alternative course of action. The trial court refused to include this element in the instructions.

The relevant portions of the instructions on justification were as follows:

You must find the defendant not guilty on grounds of justification unless the state has proved by evidence beyond a reasonable doubt any one of the following elements:

1. . . .
2. An alternative course of action was available as explained in [the following instruction.]
3. . . .
4. . . .
5. . . .

The trial court then gave this instruction:

With regard to element number 2 (Alternative Course of Action) . . . you are instructed that if a person is confronted with the use of unlawful force against himself, he is required to avoid the confrontation by seeking and using an alternative course of action. Thus, if there is evidence that, as a reasonable person, the defendant could have avoided the use of unlawful force, he must have taken or used the alternative course of action before he is justified in repelling the force used against him.

We have, then, these circumstances. The jury could have found defendant used deadly force by discharging his pistol and wounding Sederburg; that he did not first take an available alternative action; and that he is therefore not entitled to the doctrine of justification.

But defendant argues he was not obliged to take alternative action because of the exception in the statute which excuses him from doing so if the alternative involved a risk to his life or safety.

Defendant's testimony becomes vitally important here and we set it out at length.

Q. How long have you known Curtis Sederburg?

A. Approximately since 1963. That would be 15 years.

Q. And during the time describe that relationship.

A. It's always been quarrelsome.

Q. Can you explain some of those problems you might have had?

A. It started back right after I got to know Curtis in 1963.

Q. What happened then?

A. We got into a fight up in Red Oak, Iowa.

Q. And can you tell me what happened in general on that?

A. After it was all over I ended up with a black eye and a fat lip.

Q. What was your next relationship?

A. Oh, it would be not until 1972.

Q. And what was that?

A. It was an incident at the Blue Spur Lounge in Shenandoah, Iowa.

Q. Can you tell me about that?

A. Curtis came down, well, he come down with another guy and Curtis came down and he wanted to fight and he was hollering at me and they stopped him before he could get me; the bouncer to the place did, and asked him to leave and he didn't want to leave so they throwed him out.

Q. What was the next occurrence?

A. It was later on in 1972.

Q. Okay, what was that?

A. This was the time when he come down and I was down at the bar, . . . and he come in and I was just getting off my bar stool because I saw him come through the door and he knocked over the bar stool and he got to me and hit me once and I started to go down and he kicked me and tore the cartilage loose on the right side of my chest.

Q. Did this disable you?

A. Yes.

Q. How?

A. I couldn't work. It tore all the cartilage loose in my chest so I had to be under doctor's care.

.   .   .   .   .

Q. Did any other incidents occur that you can think of?

A. Yeah, there was another time after this that happened at Jim's Lounge in Shenandoah, Iowa.

.   .   .   .   .

Q. Did anything unusual occur?

A. He come up to the end of the bar where I was standing up next to the owner of the bar and told me, you know, I wouldn't mind beating your head in. And says, killing you would be fun.

.   .   .   .   .

Q. Do you know the general reputation of Curtis Sederburg?

A. Yes.

Q. In the community?

A. I do.

Q. Do you know his general reputation for turbulence, violence, bad temper?

A. Yes, I do.

.   .   .   .   .

Q. Do you have an opinion [as to his] general reputation for turbulence, bad temper, violence in the community of Shenandoah and quarrelsomeness before the 14th day of February, 1978; yes or no?

A. Yes.

Q. And what is that opinion?

.   .   .   .   .

A. It's bad.

.   .   .   .   .

Q. Now, in doing this [work as a narcotics agent] where was it necessary for you to frequent?

A. Well, I was required to build cases against known drug pushers and drug sellers.

Q. Did anyone of these people ever find out about your position?

A. Yes, they did.

.   .   .   .   .

Q. And what were the results of this; people finding out?

A. Well, there was supposedly a contract put out on me. This is the word that was on the streets and still is.

Q. Did you hear this from anybody in particular?

A. Well, I first heard it from Curt Sederburg.

Q. What did Curtis Sederburg say to you about it?

A. Curtis came and told me . . . .. He says, there is a contract out on you and, you know, I might just collect that.

.   .   .   .   .

Q. Did he make any threats to you later on, say, with or without a gun?

A. Yes, he did.

Q. Where was that?

A. This was one time me and my little brother went down to the house; going down to drink some beer. It was in the

evening and when we walked in the house Curtis was standing out in the kitchen, which was straight through the house, and he reached in this drawer and pulled a gun and he pointed it at me and told me, he says, see how easy it would have been? You would have never got to your gun.

Q. He knew you had a gun?

A. Yes.

.    .    .    .    .

Q. Were there any threats made against you through a third party?

A. Yes, there was.

Q. And who was that?

A. My mother.

Q. And what was the nature of that?

A. She came down and told me that Curtis had told her that if he got the chance he was going to take the gun away from me and stick it up me.

.    .    .    .    .

Q. How apprehensive were you of Curtis Sederburg? What did you think he might do?

A. Well, it was really hard to say what Curtis would do. I was afraid he might kill me or he could seriously injure me; bodily.

Q. What do you mean by serious injury?

A. He could maim me; break an arm; break a leg. He could beat me senseless.

Q. At any of these times when you had previous fights were you injured seriously?

A. Yes, I was.

Q. At that time were you fearful of your life?

A. Yes, I was.

Q. What type of a fighter is Curtis from your own personal knowledge?

A. Animalistic.

.    .    .    .    .

Q. What went through your mind? What did you intend to do to him?

A. I intended to stop him so he couldn't hurt me. I didn't intend to kill him.

.    .    .    .    .

Q. And then what happened?

A. Then I kind of moved back off because I knew Curtis was mad and he approached Bud and told him, he says, Take everything out of your pockets again and put it up on the hood there. There was a pickup sitting there and he says, Put it all up on the pickup and give me your billfold.

Bud said, I told you I don't have your money.

I said, Curtis, Why don't you let it go. The man does not have your money. And he says, Well, I am not going to and you mind your own damn business. And I says, Okay, I will. And I turned around and started to walk away and I was going to my car. I was heading home and Curtis was starting an argument with Bud and I turned around and looked at Bud and says, That's stupid. Turned around and Curt heard me, he said, I have had enough of your bullshit. I looked over my shoulder when he said this and he started for me.

Q. And then what did you then do?

A. I then turned and I pulled my pistol.

Q. Did you say anything to Curt at this time?

A. Not at the particular time I did not.

Q. When you say you pulled your pistol what did you do?

A. I shot once in the air and I says, Curtis, don't come any further. I will use it Curtis to stop you.

Q. And then what happened?

A. He kept coming.

Q. What did you do?

A. I shot him.

Q. Where?

A. In the arm.

The instructions, considered together, omit a critical element of defendant's defense—his right to stand his ground without taking alternative action because of his fear of injury or death at Sederburg's hands. *See* Instruction No. 416, II Iowa Uniform Criminal Law Jury Instructions.

Should defendant have backed away from the dispute at an earlier stage? Could he

have retreated when Sederburg advanced upon him immediately before the shooting? Was he justified as a reasonable person in fearing death or injury at Sederburg's hands?

These are questions the jury should have decided. The trial court told them to consider the prior threats and altercations between Sederburg and defendant in deciding if defendant acted as a reasonable person under the circumstances. The defect in the instructions is that the jury was not told any place the circumstances under which defendant was legally entitled to use reasonable force without first taking alternative action. We hold this was reversible error and defendant is entitled to a new trial.

II. This brings us to the second charge against defendant—violation of § 724.26, which forbids a convicted felon from transporting and possessing firearms. By agreement the issue concerning defendant's previous conviction of a felony was reserved for separate determination if the jury first found, as it did, that he had transported and possessed such a weapon.

Defendant raises these two objections to his conviction on Count II:

1. There is no proof in the record to establish the previous felony conviction.

2. § 724.26 is unconstitutional in violation of Amendments II and XIV to The Constitution of the United States.

■ Defendant admitted his conviction of a felony, including the exact crime (uttering a forged instrument) and the date of conviction (1966). This obviated the necessity for any formal proof. See § 622.17, Iowa Criminal Code. There is no merit to defendant's first proposition.

■ Nor do we agree with his second complaint. He argues the statute is overbroad because it brings within its prohibition those convicted of non-violent as well as violent crimes. He also argues it impermissibly infringes on his constitutional right to bear arms. The right to bear arms under the second amendment is not an absolute one. It is subject to reasonable regulation. *United States v. Miller,* 307 U.S. 174, 178, 59 S.Ct. 816, 818, 83 L.Ed. 1206, 1209 (1939); *United States v. Houston,* 547 F.2d 104, 107 (9th Cir. 1976); *United States v. Synnes,* 438 F.2d 764, 772 (8th Cir. 1971), *vacated on other grounds,* 404 U.S. 1009, 92 S.Ct. 686, 687, 30 L.Ed.2d 657 (1972). The constitutional protection extends only to situations bearing some "reasonable relationship to the preservation or efficiency of a well regulated militia." *Cody v. United States,* 460 F.2d 34, 37 (8th Cir.), *cert. denied,* 409 U.S. 1010, 93 S.Ct. 454, 34 L.Ed.2d 303 (1972).

This same argument was made and rejected in *Marchese v. California,* 545 F.2d 645, 647 (9th Cir. 1976):

The right to bear arms, especially easily concealable handguns, is not the type of fundamental right to which the "compelling state interest" standard applies. *United States v. Synnes,* 438 F.2d 764, 771 n.9 (8th Cir. 1971), vacated on other grounds, 404 U.S. 1009, 92 S.Ct. 687, 30 L.Ed.2d 657 (1972). *See e. g., People v. Camperlingo,* 69 Cal.App. 466, 473, 231 P. 601, 604 (1924).

Also, felons may belong to a suspect classification, but not in any sense that helps the petitioner. There is a legitimate interest in minimizing the felonious use of firearms, and a legislature reasonably may decide that persons with criminal convictions have more of a tendency to commit a crime of violence than persons without criminal records. *United States v. Karnes,* 437 F.2d 284, 289 (9th Cir.), *cert. den.,* 402 U.S. 1008, 91 S.Ct. 2189, 29 L.Ed.2d 430 (1971). We find no basis for the petitioner's attack on the statute.

In that case the California statute, like ours, prohibited possession of handguns by one previously convicted of a nonviolent as well as violent felony.

Defendant is not entitled to relief on either of the constitutional arguments urged. The judgment on the conviction for illegal possession of a firearm is affirmed.

III. In summary we reverse as to Count I (assault with intent to commit murder) and remand for a new trial.

We affirm as to Count II (illegal possession of firearms.)

REVERSED AND REMANDED AS TO COUNT I; AFFIRMED AS TO COUNT II.