# IN THE COURT OF APPEALS OF IOWA

No. 13-1255
Filed January 28, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BRUCE DARNELL POLLARD JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Wapello County, Lucy J. Gamon,

Judge.


        A defendant appeals his conviction for first-degree murder and first-degree

robbery.  **AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant

Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Darrel Mullins and Scott Brown,

Assistant Attorneys General, and Lisa Holl, County Attorney, for appellee.


        Heard by Danilson, C.J., and Doyle and Tabor, JJ.

**TABOR, J.**

Bruce Pollard walked into Cinema X carrying a crow bar. Pollard used the bar to strike the theater manager in the head and to strangle him. Pollard left about twenty minutes later carrying a bag of merchandise. Pollard alleged he acted in self-defense, but a jury convicted him of murder in the first degree and robbery in the first degree.

He appeals those convictions, alleging two omissions by his trial attorney in handling the jury instructions. First, Pollard claims counsel breached a material duty in not objecting to robbery as the predicate offense for felony murder. Second, Pollard claims counsel failed to request a justification instruction on the exception to taking an alternative course of action. Because Pollard does not satisfy his burden to prove ineffective assistance of counsel in either instance, we affirm.

I.      **Background Facts and Proceedings**

Kenneth McDaniel died at the same locale where he lived and worked for more than twenty years. McDaniel managed Cinema X, an adult movie theater in downtown Ottumwa. He also lived in the theater, sleeping on a cot under the projector. The theater was a low-budget operation. For five dollars, patrons could watch a pornographic movie on the projection screen. Cinema X also sold adult magazines, DVDs, and other novelties.

Sunday, March 11, 2012—the day he was killed—unfolded like many others for seventy-year-old McDaniel. His sister-in-law brought him fast food from Sonic between 5:00 and 5:30 in the evening. She then went across the

street to General Dollar to buy minutes for McDaniel's cell phone. She did not notice any customers in the theater. She chatted with McDaniel, gave him the change from the purchase of the minutes, and left. Around 6:00 p.m., McDaniel's friend Marlin Hesse tried to visit McDaniel in the theater but the door was locked and no one answered the door bell. Hesse knew it was not unusual for McDaniel to close early on Sunday and left.

On March 13, a passerby found McDaniel's body by the theater's counter, three feet from the front door. McDaniel was wearing a shirt, a jacket, and two pairs of pants. McDaniel often dressed in layers because he kept the theater cool to cut down on heating bills. His belt was undone and both pairs of pants were unzipped. McDaniel's glasses were broken. Investigators found McDaniel's blood on the counter, two shelving units, the carpet, and the wood paneling. His blood was also on the steps behind the counter leading to the projectors and the area where he slept. McDaniel's hyoid bone and thyroid cartilage were broken. Later, the medical examiner determined his cause of death was blunt-force injuries to the head and neck, and asphyxiation caused by strangulation.

Reviewing footage captured on March 11 from downtown traffic cameras and surveillance cameras from nearby businesses, law enforcement officers saw a suspect enter the cinema at 5:52 p.m. and leave at 6:12 p.m. The person was carrying a crow bar. When the suspect left, he had a black bag slung over his shoulder that he did not have when he entered the cinema.

Further investigation led law enforcement to Pollard. Officers determined Pollard had been spending time at the Promise Center, a drop-in resource center for adults with mental illnesses. A search of the center uncovered DVDs with price tags on them consistent with the ones sold at the cinema. Technicians found both McDaniel's and Pollard's fingerprints on them. The police also found a Stanley crow bar resembling the one the suspect carried in the video footage. Later testing revealed dried blood on the crow bar belonging to both McDaniel and Pollard. Yellow paint on the claw end of the crow bar matched paint chips found in McDaniel's head wound. Police also found a shirt belonging to Pollard with McDaniel's blood on it. After Pollard left the cinema, he removed the bloody shirt, threw it under a chair at the Promise Center, put on a different shirt, and returned home.

After initially denying any involvement, Pollard admitted killing McDaniel on March 11. But Pollard claimed he acted in self-defense. In a letter to his girlfriend's mother, Pollard said he "panicked" when McDaniel sat "real close" to him in the theater. He also denied killing McDaniel during the course of a robbery; instead Pollard said he only took thirty dollars and some DVDs from the cinema after the struggle with McDaniel to make it look like a robbery.

On July 11, 2012, the State charged Pollard with one count of murder in the first degree and one count of robbery in the first degree. Pollard asserted the defenses of justification and diminished capacity. Following a six-day trial, a jury convicted Pollard on both counts, returning its verdicts on July 23, 2013. The district court sentenced Pollard to a term of life imprisonment on the murder

conviction and twenty-five years on the robbery conviction. The court ordered the sentences to run consecutively. Pollard now appeals.

## II.  Analysis of Ineffective-Assistance-of-Counsel Claims

Pollard criticizes his trial counsel for mishandling two jury instruction issues. First, Pollard claims his attorney was remiss in not objecting to the felony-murder alternative in the marshalling instruction based on the predicate offense of robbery. Second, he contends counsel was ineffective in not requesting an instruction explaining the exception to the alternative-course-of-action requirement for his justification defense.

We review Pollard's claims of ineffective assistance de novo. *See State v. Ondayog*, 722 N.W.2d 778, 783 (Iowa 2006). To establish his claims of ineffective assistance of counsel, Pollard must prove by a preponderance of the evidence: (1) trial counsel failed to perform an essential duty and (2) prejudice resulted from his failure. *See State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012) (quoting *Strickland v. Washington*, 466 U.S. 668, 693 (1984)). A defense attorney fails to perform an essential duty when his performance falls below the "normal range of competence." *State v. McPhillips*, 580 N.W.2d 748, 754 (Iowa 1998). We presume counsel has performed within that range of competence. *State v. Fannon*, 799 N.W.2d 515, 520 (Iowa 2011). A defendant may overcome that presumption by showing counsel failed to raise a valid objection. *Id.* But we will not find counsel ineffective in failing to lodge an objection lacking in merit. *Id.* Prejudice means the reasonable probability of a different outcome. *Ledezma v. State*, 626 N.W.2d 134, 145 (Iowa 2001).

Generally, we preserve ineffective-assistance-of-counsel claims for postconviction relief proceedings to allow for thorough development of the facts. *State v. Atley*, 564 N.W.2d 817, 833 (Iowa 1997). We do resolve claims on direct appeal when the record allows us to do so. *State v. Arne*, 579 N.W.2d 326, 329 (Iowa 1998). We find the record in this case sufficient to decide Pollard's claims. We will address each claim in turn.

### A. Felony Murder Instruction

The district court instructed the jurors that they could convict Pollard of murder in the first degree if they found *either* he acted willfully, deliberately, premeditatedly, and with the specific intent to kill McDaniel *or* he was participating in a robbery at the time of the killing. *See* Iowa Code §§ 707.2(1) (premeditated killing), (2) (killing while participating in a forcible felony), 702.11(1) (listing forcible felonies as "felonious child endangerment, assault, murder, sexual abuse, kidnapping, robbery, arson in the first degree, or burglary in the first degree").

Pollard now claims his attorney should have objected to instructing the jurors on the felony murder alternative because "there was insufficient evidence the assault element of robbery, the predicate felony, was a separate independent act from the act that killed McDaniel." To support his position, Pollard relies on a triumvirate of cases: *State v. Heemstra*, 721 N.W.2d 549, 557 (Iowa 2006); *State v. Millbrook*, 788 N.W.2d 647, 650 (Iowa 2010); and *State v. Tribble*, 790 N.W.2d 121, 129-30 (Iowa 2010).

In *Heemstra*, our supreme court held the felonious assault of willful injury could serve as the predicate offense for felony murder only in certain circumstances, for instance, "if the defendant assaulted the victim twice, first without killing him and second with fatal results." *Heemstra*, 721 N.W.2d at 556. In *Millbrook*, the court considered a felony murder conviction predicated on the defendant's participation in the felonious assault of intimidation with a dangerous weapon, concluding "the fact that intimidation with a dangerous weapon is not a lesser-included offense of first-degree murder does not preclude application of the merger doctrine enunciated in *Heemstra*." *Millbrook*, 788 N.W.2d at 652. The *Millbrook* court ultimately upheld the murder conviction, finding the defendant committed an assaultive act sufficiently independent of the firing of the gun that resulted in the victim's death. *Id.* at 653–54. In *Tribble*, the court again considered a felony murder conviction based on the felonious assault of willful injury, and upheld the conviction because substantial evidence supported a jury finding that head trauma and asphyxia were caused by separate acts, either of which could have been the factual cause of the victim's death. *Tribble*, 790 N.W.2d at 129. Notably, *Heemstra*, *Millbrook*, and *Tribble* all address murder cases predicated on the forcible felony of felonious assault.

None of the cases relied upon by Pollard discusses the possibility of merger when robbery serves as the predicate felony for felony murder. In fact, the *Heemstra* court twice quoted authorities which identified robbery as an independent felony, not subject to merger. *See Heemstra*, 721 N.W.2d at 556, 558 (citing *Commw. v. Quigley*, 462 N.E.2d 92, 95 (Mass. 1984) (quoting Wayne

R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 71, at 559 (1972) ("although rape, arson, robbery and burglary are sufficiently independent of the homicide, . . . aggravated battery toward the deceased will not do for felony murder") and citing *People v. Moran*, 158 N.E. 35, 36 (N.Y. 1927) ("The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape.")). *Millbrook* likewise quoted the *Moran* case from the New York Court of Appeals. *Millbrook*, 788 N.W.2d at 651.

A key question when considering the adequacy of Pollard's representation is whether competent defense counsel needed to urge an extension of those cases involving felonious assaults to felony murder prosecutions predicated on other forcible felonies listed in section 702.11(1). Counsel contemplating such an argument may have been deterred by our court's recent decision in *State v. Tucker*, 810 N.W.2d 519, 522 (Iowa Ct. App. 2012). In that case, we declined to extend the *Heemstra* merger rule to the predicate felony of arson, reasoning as follows:

> Unlike assault, using arson as the predicate felony does not frustrate the legislature's intent to establish gradations for assaultive conduct that results in death. Rather, application of the felony-murder rule in the case of arson is consistent with the traditional purpose of the felony-murder rule: deterring people from committing those felonies that present a heightened risk of death to others by transforming the felony offense sought to be deterred into first-degree murder if a person is killed in the course of the felony, even though the felon had no specific intent or premeditation otherwise necessary to elevate the killing of another into first-degree murder. *Heemstra,* 721 N.W.2d at 554 ("The rationale of the felony-murder rule is that certain crimes are so inherently dangerous that proof of participating in these crimes may obviate

the need for showing all of the elements normally required for first-degree murder.").

*Tucker*, 810 N.W.2d at 522.

Against this backdrop of case law on the merger rule, we decline to find counsel was ineffective for not challenging the felony murder instruction. We cannot rule out the possibility our supreme court might ultimately extend the merger rule for felony murder to the predicate felony of robbery. But it has not done so yet. Accordingly, we reject Pollard's argument that his attorney provided subpar representation by not objecting to robbery as the underlying felony. We do not require defense counsel to be a "'crystal gazer"—channeling the ability to predict future developments in the law. *See State v. Liddell*, 672 N.W.2d 805, 814 (Iowa 2003). Counsel did not breach an essential duty by failing to object to the marshalling instruction. *See State v. Williams*, 695 N.W.2d 23, 30 (Iowa 2005).

Moreover, even if the merger rule from *Heemstra*, *Tribble*, and *Millbrook* did apply to the underlying felony of robbery as marshalled in this case, defense counsel did not have a duty to object to the felony murder instruction. Defense counsel was safe in assuming the situation was governed by *Tribble*, where the court rejected the defendant's claim that the felony-murder statute did not apply when two independent assaultive acts both contributed to the victim's death. *See Tribble*, 790 N.W.2d at 129 (explaining "[i]f the acts of blunt-force trauma were also a factual cause of death, felony murder applies in this case because a

separate act of asphyxia was also a factor cause).[1]  Here, the record shows Pollard committed at least two discrete assaults, either of which may have caused McDaniel's death according to the medical examiner.  The State persuasively argues: "If the blunt force trauma was a cause of death, felony murder applies because Pollard also committed an act of strangulation.  If the blunt force trauma—such as the distinctive claw-hammer wound—did not cause McDaniel's death, then the felony-murder doctrine applies because it is an 'assault' for purposes of the independent felony of robbery."

On these facts and under the existing case law, counsel did not breach a material duty in declining to object to the felony murder alternative in the marshalling instruction.

### B.  Justification Instructions

The jury received instructions on Pollard's justification defense.  The marshalling instructions on murder required the jury to find Pollard was not acting with justification.  Justification was defined for the jury as the use of reasonable force.  The definitional instruction stated: "A person can use reasonable force against another if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or it is reasonable to believe that such force was necessary to resist a like force or threat."  The court informed the jury that

---

[1] Pollard contends the victim's death resulted from one continuous struggle without any break in the action to support two distinct assaults.  He relies on *State v. Velez*, 829 N.W.2d 572, 570-83 (Iowa 2013) and *State v. Ross*, 845 N.W.2d 692, 705 (Iowa 2014), which address unit-of-prosecution questions.  Pollard's contention conflicts with his own statements which described separate acts of hitting the victim in the head, struggling over the crow bar, and then strangling the victim.  The physical evidence, including blood found in various locations, also indicates separate assaults.  Further, we do not find any directives in *Velez* or *Ross* that would undermine the analysis from *Tribble*.

the State had the burden to prove Pollard was not acting with justification. The court instructed the jury that Pollard was not justified in his actions if the State proved any of the following elements:

1) [Pollard] started or continued the incident which resulted in death.
2) An alternative course of action was available.
3) [Pollard] did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.
4) [Pollard] did not have reasonable grounds for the belief.
5) The force used by [Pollard] was unreasonable.

The court provided the jury with instructions explaining exceptions three and four, but not the uniform instruction explaining circumstances when the defendant is not required to take an alternative course of action under element two.

On appeal, Pollard claims his counsel was ineffective for failing to request this additional instruction: "If the alterative course of action involved risk to his life or safety, and he reasonably believed that, then he was not required to take or use the alternative course of action to avoid the confrontation and he could repel the force with reasonable force." Iowa Criminal Jury Instruction No. 400.10.; *see generally State v. Rupp*, 282 N.W.2d 125, 126 (Iowa 1979). Pollard claims he was prejudiced by the absence of this instruction because justification was his primary defense.

At trial, Pollard offered what has been referred to as a "gay panic defense"—though not calling it by that name.[2] Pollard claimed he was justified in

---

[2] Academics describe "gay panic" as a defense advanced by a heterosexual man who claims he "panicked and killed" because his allegedly gay victim made an unwanted sexual advance. Cynthia Lee, *The Gay Panic Defense*, 42 U.C. Davis L. Rev. 471, 471 (2008); *see also* David Alan Perkiss, *A New Strategy of Neutralizing the Gay Panic Defense at Trial: Lessons from the Lawrence King Case*, 60 U.C.L.A. Rev. 778, 780 (2013).

attacking McDaniel because McDaniel allegedly made a sexual advance toward him in the theater. Pollard, who admitted carrying the crow bar into the theater with him, asserted McDaniel sat next to him during the movie.[3] Pollard allegedly told McDaniel the interaction was inappropriate, then Pollard said he felt something on his leg at which point he "fucking panicked."[4] According to Pollard, he ran to the front door but it was locked. When he turned around, McDaniel was behind him. Pollard said he then grabbed the crow bar from his pocket and hit McDaniel on the head. A struggle ensued, according to Pollard. Pollard remembered strangling McDaniel, then hitting him with the crow bar again. Pollard admitted taking money from the cash box and DVDs, but claimed he did so only to make it look like a robbery. To support the theory that a sexual advance occurred, the defense pointed to the victim's unzipped pants, an abrasion on McDaniel's penis, and a white stain on a pair of pants. No evidence was presented that McDaniel was gay or sexually violent.

In addition to Pollard's claims in his interviews with police and his letter to Dixie Day, the jury heard evidence detailing the conditions of the crime scene, the multiple injuries to McDaniel, and Pollard's conduct following the killing. We are mindful "[t]he jury is free to believe or disbelieve any testimony as it chooses." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993).

---

[3] Because Pollard did not testify at trial, his version of events reached the jury through his interview with investigator Steve Harris and his letter to Dixie Day delivered in October 2012.

[4] At trial, the defense offered testimony about Pollard's diminished capacity, including his history as a victim of sexual abuse. Doctor Craig Rypma testified Pollard stole things because Pollard would rather be thought of as a thief than as "sexually accosted by Mr. McDaniel."

On this record, Pollard cannot prove he was prejudiced by counsel's failure to ask for Iowa Criminal Jury Instruction No. 400.10. We find no reasonable probability the outcome of the trial would have been different had counsel requested the instruction explaining an exception to the alternate-course-of-action requirement. Initially, we note the instruction defining justification conveyed much of the same information as the omitted instruction, *i.e.* a defendant may use reasonable force to avoid injury or a risk to his life or safety. Moreover, the State presented strong evidence Pollard started or continued the struggle which resulted in McDaniel's death, having entered the theater armed with a crow bar and by his own admission leveled the first blow to McDaniel's head. The State also presented strong evidence Pollard did not reasonably believe McDaniel, who was much older and unarmed, posed an imminent danger of death or injury. Finally, the State's evidence overwhelmingly established Pollard used an unreasonable level of force, applying the sustained pressure necessary to break McDaniel's hyoid bone and asphyxiate him. Given the overwhelming evidence supporting Pollard's guilt and the negligible effect the omitted instruction would have had on the jury's verdict, we conclude no reasonable probability existed that, but for counsel's failure to request the instruction, the result of the proceedings would have been different. *See State v. Maxwell*, 743 N.W.2d 185, 197 (Iowa 2008).

In summary, we conclude counsel was not ineffective in his handling of the jury instructions on felony murder or justification.

**AFFIRMED.**