# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3368

_____

Sharon C. Dooley, as the Administrator of the Estate of the Deceased R. Michael
Dooley; Tristan Brooke Engler; Kara E. Krapfl; Nathaniel J. Dooley; Alex M.
Dooley; Joseph D. Dooley

*Plaintiffs - Appellants*

v.

Jon Tharp, in his Individual Capacity

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: April 12, 2016
Filed: May 15, 2017

_____

Before WOLLMAN, BEAM, and MURPHY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

On October 16, 2012, R. Michael Dooley was shot and killed by Van Buren
County, Iowa, Deputy Sheriff Jon Tharp. The administrator of Dooley's estate and
Dooley's five children filed suit against Tharp, alleging an excessive-force claim

under 42 U.S.C. § 1983 and related tort claims under Iowa law. The district court[1] granted Tharp's motion for summary judgment based on qualified immunity and Iowa law. We affirm.

At approximately 11:00 on that clear October morning, a 911 dispatcher in Keosauqua, Iowa, received a call reporting that a man dressed in a military uniform and armed with a rifle was "flipping off" passing motorists as he walked west on Highway 2 toward Cantril, Iowa. A second caller reported the same information and noted that the man may have exited a car that was parked near the highway. According to the second caller, an upside down American flag hung from the parked car's open trunk.

Deputy sheriffs Jon Tharp and Bradley Hudson were on duty in the Van Buren County Sheriff's Office when the calls came in. Hudson, who was chief deputy sheriff and acting sheriff that day, decided that he and Tharp would together respond to the calls, using Hudson's patrol vehicle, a 2011 Ford F150 SuperCrew pickup truck. The vehicle displayed law enforcement markings on its body, and the top of the cab was equipped with a light bar that flashed red, white, and blue lights when activated. The truck also had a microphone installed in the headliner above the passenger seat and a camera mounted in the center of the dashboard that pointed outward. The audio/video system automatically began recording whenever the truck's emergency lights were activated.

Both Hudson and Tharp were wearing uniforms and bulletproof vests. They had been assigned AR-15 .223-caliber rifles and 12-gauge shotguns, which they carried in their separately assigned patrol vehicles. While entering his patrol vehicle,

---

[1]The Honorable Helen C. Adams, now Chief Magistrate Judge, United States District Court for the Southern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

Hudson removed his rifle from its locked mount and placed it between his legs, where he could easily reach it while driving. After retrieving his rifle and shotgun, Tharp sat in the front passenger seat of Hudson's vehicle. Hudson activated the vehicle's siren and emergency lights as he drove away from the sheriff's office, causing the audio/video system to begin recording, and sped south on Highway 1 toward its intersection with Highway 2.

As they proceeded on their journey, the officers began discussing what they would do upon encountering the now-afoot motorist, using what Hudson described as "gallows humor," an example of which was Tharp's statement, "F--- it. Shoot him," accompanying his remark with a laugh. When Hudson spoke about what might happen if the man had a gun and pointed it at the officers, Tharp interrupted, saying, "Blast his ass." Tharp also expressed concern that the parked car displayed an upside down American flag, later testifying that he thought it might indicate anti-government sentiment. Hudson recognized that the upside down flag might also signify distress. Both officers were concerned about whether the man had had military training, based on the reports that he was wearing a military uniform. Possessing only the information they had received from dispatch, Hudson and Tharp decided to pursue the following strategy: Tharp would roll down the passenger side window and "stick [his] gun out the window as [they] approach[ed]." Upon seeing the man, Tharp would "start telling him to drop the f---ing gun." The deputies discussed whether Tharp should remain in the cab or move to the cargo area of the truck, but they did not discuss any alternative ways of approaching the man, nor did they reconsider their plan after the man came into view.

It was approximately twelve miles from the sheriff's office to where the solitary walker was finally spotted, with Hudson driving at speeds of 85 to 90 miles per hour. After they had driven some four miles, Hudson turned off his patrol vehicle's siren but kept the emergency lights activated, later explaining that he did not want to alert the man to the deputies' presence or otherwise give him an

-3-

opportunity to take a defensive position. While en route, Hudson and Tharp received a report from dispatch that it had received another call regarding the man.

The officers drove past a sedan with an open trunk that was parked on the shoulder of Highway 2. An American flag lay crumpled on the ground behind the car. Less than a minute later, Hudson spotted the man—later identified as Dooley—walking west along the north side of the highway. Hudson said to Tharp, "There he is, Jon. He's on your side." Hudson testified that he observed Dooley "flip off" a car that was driving east. The video recording shows that a red truck heading west drove unmolested past Dooley a few seconds before the officers reached him. Soon thereafter, Tharp said, "He's got the f---ing gun." Dooley seemed unaware of any law enforcement presence as the patrol vehicle approached him. Some six minutes had elapsed from the time the audio/video system began recording to the time the officers first saw Dooley.

Because Dooley and the patrol vehicle were both heading west, the video recording shows Dooley from behind. He was dressed in a brown wide-brimmed hat, a tan-colored coat, and tan jodhupur-style pants that were tucked into his brown knee-high riding boots. He carried what appeared to be a rifle over his right shoulder. The rifle was tucked mostly between the right side of Dooley's body and his right arm, with the stock positioned behind Dooley and pointed toward the sky, the muzzle pointed toward the ground, and Dooley's right hand placed on or near the barrel. Hudson testified that "[the rifle] appeared to be slung over his right shoulder."

As Hudson pulled over to the shoulder of the highway and slowed down, Tharp leaned out of the passenger side window yelling, "Drop the gun! Drop it!" The video shows Dooley turning clockwise to face east, where the patrol vehicle was coming to a stop. After completing the turn, Dooley's body was not quite square with the camera, with the muzzle of his rifle remaining pointed toward the ground. The video shows Dooley quickly taking hold of the barrel with his right hand and bringing his

right hand toward his waist, whereupon Tharp again shouted, "Drop the gun! Drop it!" The video then shows Dooley using his right hand to move the rifle in a manner that the district court described as "arc-like," during the course of which Dooley moved his left hand. Tharp fired a single shot that struck Dooley's skull, killing him instantly. Some five seconds elapsed from the time Tharp yelled the first command to the time he fired the fatal shot.

It was soon determined that what had appeared to the officers to be a real rifle was in reality a pellet gun that had been attached to a wire sling that had been buttoned under the right epaulet of Dooley's coat. That after-the-fact information served to explain Dooley's hand movements as his attempt to loosen the wire sling or unbutton the epaulet in an apparent attempt to comply with Tharp's command to drop the weapon.

This lawsuit was initially filed in Iowa state court. The petition set forth a federal claim under 42 U.S.C. § 1983, alleging that Tharp had employed excessive force in violation of Dooley's Fourth Amendment rights, and related state-law claims of assault and battery, negligence, and loss of consortium. Tharp removed the action to federal district court and filed a counterclaim for intentional infliction of emotional distress. The district court granted Tharp's motion for summary judgment on the § 1983 claim, concluding that he was entitled to qualified immunity because Tharp's use of force was objectively reasonable. Based on that conclusion, the district court also granted summary judgment on the state-law claims. It later dismissed Tharp's counterclaim without prejudice and entered judgment in favor of Tharp.

We review *de novo* a district court's grant of summary judgment on the basis of qualified immunity. Loch v. City of Litchfield, 689 F.3d 961, 965 (8th Cir. 2012). We view the evidence in the light most favorable to the plaintiffs and draw all reasonable inferences in their favor. Id. Summary judgment is appropriate if "there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Qualified immunity shields a law enforcement officer from liability in a § 1983 action unless the officer's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Loch, 689 F.3d at 965. Qualified immunity involves the following inquiries: (1) whether the facts alleged, taken in the light most favorable to the plaintiffs, show that the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the officer's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001); see also Pearson v. Callahan, 555 U.S. 223, 236 (2009) (holding that courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first).

The plaintiffs contend that Deputy Tharp violated Dooley's Fourth Amendment right to be free from the use of excessive force. To establish this alleged constitutional violation, the plaintiffs must show that the amount of force Tharp used was not reasonable under the circumstances. See Graham v. Connor, 490 U.S. 386, 396 (1989). "The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." Loch, 689 F.3d at 965 (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985)). "Before employing deadly force, an officer should give 'some warning' when it is 'feasible' to do so." Id. at 967 (quoting Garner, 471 U.S. at 11-12).

We evaluate the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. This calculus recognizes that officers must make split-second judgments regarding the amount of force necessary in a particular situation and that the circumstances surrounding those judgments can be "tense,

uncertain, and rapidly evolving." Id. at 397. Nevertheless, "the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id.

Viewing the evidence in the light most favorable to the plaintiffs, and considering the totality of the circumstances leading up to Tharp's shooting of Dooley, we conclude that the district court did not err in ruling that Tharp's use of deadly force was objectively reasonable as a matter of law. When the deputies left the sheriff's office, they knew that Dooley was dressed in a military uniform, that he was carrying a rifle, that he had made rude gestures to vehicles as they passed by, and that he might be associated with a parked car that displayed an upside down American flag. Both deputies described the situation as potentially dangerous, given the possibility that the man had had military training, the presence of a firearm, and the possibility that the flag indicated that the man harbored some anti-government sentiment. The circumstances then known to the deputies, however, also included that Dooley had committed no crime and that he had not employed his rifle in a threatening manner towards passing motorists.

New information came to light as the officers approached Dooley. Hudson testified that he saw Dooley make a rude gesture to a car as it drove past him. The video also shows that when the red truck passed by Dooley, he continued to walk along the shoulder of the highway. He did not turn his body toward the truck, reach for his rifle, or make any threatening movements. As the patrol vehicle approached Dooley from the rear, it became obvious that Dooley was not wearing a modern military uniform, but rather a vintage one. As the patrol vehicle quickly pulled behind Dooley, he did not immediately turn around or even change the manner in which he was walking.

The officers had several minutes to decide how best to approach Dooley. They also had the opportunity to modify their plan after Dooley came into view and a more complete set of circumstances became known to them. The minutes-long drive from the sheriff's office and the moments leading up to Tharp leaning out the window and screaming at Dooley to drop the rifle cannot be described as chaotic. Dooley had done nothing illegal, and there is no evidence that he had threatened physical harm to anyone. The circumstances did not become tense, uncertain, or rapidly evolving until Tharp, in his words, "began screaming at [Dooley] to '[d]rop the gun.'"

Tharp testified that when he screamed the command to drop the gun, "[i]nstantaneously, the subject began to turn toward us and I saw him spin around, raising his rifle and pointing it at me." According to Tharp, he believed "that the subject was going to fire at me or Deputy Hudson unless I fired first." Hudson testified that Dooley had pointed the rifle at Tharp and "look[ed] directly at Deputy Tharp as he moved his rifle into a firing position."

When viewed frame-by-frame, the video appears to contradict the officers' description. It shows Dooley turning to face the deputies and using his right hand to maneuver the rifle.[2] It also shows that Dooley did not place his right hand near the trigger and did not place his left hand on the rifle. It shows that at the moment of the bullet's impact, Dooley's arms were crossed over his chest and the muzzle of the rifle was pointed toward the sky. As we said in Aipperspach v. McInerney, 766 F.3d 803, 808 (8th Cir. 2014), "[w]e agree with the general proposition that a video of the

---

[2]There is no dispute that Dooley's pellet gun appeared to be a real firearm. According to an analysis by the Washington Post, during 2015-2016 police officers shot and killed eighty-six individuals who were armed with imitation firearms like pellet guns, toy weapons, and non-functioning replicas. John Sullivan et al., Deadly Run-ins, Replica Guns, Wash. Post, Dec. 19, 2016, at A1, A8 ("Police say it is virtually impossible to train officers to identify imitation firearms from any distance.").

incident can create a genuine issue of material fact that precludes the grant of summary judgment in an excessive force case." When viewed in slow motion, the video of Dooley's actions could be seen as creating a genuine issue of fact whether Tharp used excessive force in the light of Dooley's response to the shouted commands to drop the gun. But law enforcement officers are not afforded the opportunity of viewing in slow motion what appears to them to constitute life-threatening action. In contrast to the situation in Scott v. Harris, 550 U.S. 372, 378 (2007), the real-time view of the video does not clearly contradict Tharp's account of what he perceived Dooley's actions to have been. Cf. Boude v. City of Raymore, No. 16-1183, 2017 WL 1749664, at *__ (May 5, 2017) (concluding that, even though the video evidence did not "blatantly contradict" the plaintiff's factual allegation that she was reaching for the gear shift to ensure her vehicle was in park, the officer's belief to the contrary was objectively reasonable) (citing Scott, 550 U.S. at 380). Accordingly, we must view Tharp's mistaken-perception action for objective reasonableness. See Loch, 689 F. 3d at 966 ("An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment.").

In Sinclair v. City of Des Moines, 268 F.3d 594 (8th Cir. 2001) (per curiam), we upheld the grant of qualified immunity to an officer who had shot a person who the officer believed was holding a long-barrel rifle, agreeing with the district court's conclusion "that no constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon." Id. at 596. Likewise in Partlow v. Stadler, 774 F.3d 497 (8th Cir. 2014), we upheld the grant of qualified immunity to officers who fired shots after they had "observed Partlow move the shotgun in such a way that [they] believed that Partlow was aiming the barrel of the shotgun at them." Id. In Aipperspach, 766 F.3d at 807, we said that "[t]he responding officers were confronted with a suspect who held what appeared to be a handgun, refused repeated commands to drop the gun, pointed it once at [a responding officer], and then waved it in the direction of officers deployed along the

ridge line in an action they perceived as menacing." 766 F.3d at 807; see also Malone v. Hinman, 847 F.3d 949, 954-55 (8th Cir. 2017) (upholding the grant of qualified immunity to an officer who knew that "approximately three gunshots had just been fired in a crowd of 40 to 50 people" and who thereafter shot a person who was carrying a gun, running toward an officer and others, and did not comply with an order to stop). Viewing the dash-cam video at regular speed and considering the facts of this case in light of the forgoing decisions, we conclude that Tharp's mistaken perception that Dooley posed a threat of serious physical harm to Tharp was objectively reasonable. We agree with the district court's determination that "[a] reasonable officer could believe that at some point in this arc of movement the man was pointing his gun at the officers and [could] feel himself to be at risk of serious harm." D. Ct. Order of August 31, 2015, at 12. We thus conclude that, however tragic the circumstances of Dooley's death, Tharp was correctly granted qualified immunity in the constitutionally based action.

In light of the post-shooting facts discovered by Hudson and Tharp, a less confrontational approach to the situation facing them—one that might have given them time to recognize that Dooley was in fact attempting to comply with Tharp's twice-shouted commands to drop the gun rather than preparing to fire upon him—might have prevented this needless loss of life. See Richard Pérez-Peña, When 'Yelling Commands' Is the Wrong Police Response, N.Y. Times, Sept. 26, 2016, at A12-A13 (describing a growing trend to teach officers to de-escalate tensions). Similarly, in retrospect, and with the 20/20 vision of hindsight, had Tharp identified himself as a law enforcement officer and given a warning, Dooley might well have reacted in such a way that did not involve maneuvering the barrel of the rifle as he did. As it was, however, Dooley's decision to fasten the pellet gun to his epaulet, coupled with Tharp's mistaken belief that Dooley was taking aim at the officers, ultimately resulted in his death.

As set forth earlier, the complaint pleaded state tort claims of assault and battery and negligence, alleging that Tharp had used unreasonable force. The loss of consortium claim alleged that Tharp's actions had caused Dooley's children to be deprived of the companionship of their father. Having determined "on the federal claim that Tharp's use of force was objectively reasonable," the district court granted Tharp's motion for summary judgment on the state claims based on his affirmative defenses of justification and self-defense. D. Ct. Order of Aug. 31, 2015, at 14 (citing Iowa Code §§ 704.1 and 804.8). We agree with the district court's disposition of those claims. See State v. Rupp, 282 N.W.2d 125, 126 (Iowa 1979) (setting forth the definition of "reasonable force" and explaining that Iowa Code § 704.1 sets forth a defense of justification or self defense, which allows an individual, "under certain circumstances, to use force in defending himself"); Chelf v. Civil Serv. Comm'n, 515 N.W.2d 353, 355 (Iowa Ct. App. 1994) (citing Graham, 490 U.S. at 396-99) ("find[ing] the 'reasonableness' inquiry in Iowa Code section 804.8 [to be] an objective standard").

The district court's order granting summary judgment in favor of Tharp on the constitutional claim is affirmed, as is the grant of summary judgment on the state-law based claims.

_____

-11-