Leonard T. Strand, Chief Judge
I. INTRODUCTION
This case is before me on a motion (Doc. No. 63) for summary judgment filed by defendants City of Cedar Rapids, Nathan Juilfs, Lucas Jones, Brandon Boesenberg and Bryson Garringer. Plaintiffs have filed a resistance (Doc. No. 90) and defendants have filed a reply (Doc. No. 101). Also pending is defendants' motion (Doc. No. 102) to strike portions of plaintiffs' resistance to the motion for summary judgment. Oral argument is not necessary to resolve the pending motions. See N.D. Iowa L.R. 7(c).
II. PROCEDURAL BACKGROUND
Plaintiffs commenced this case by filing a petition (Doc. No. 2) in the Iowa District Court for Linn County. Defendants filed a notice of removal on November 28, 2017. Doc. No. 1. The petition asserts the following claims for relief under 42 U.S.C. § 1983 and Iowa law, all arising from an arrest and subsequent events on October 20, 2015, that resulted in the death of Jonathan Gossman:
Count I: Stop without probable cause (Juilfs, Garringer and Boesenberg);
Count II: Seizure of vehicle and Gossman without probable cause (Juilfs, Garringer and Boesenberg);
Count III: Arrest of Gossman without probable cause (Juilfs, Garringer and Boesenberg);
Count IV: Use of excessive force against Gossman (Jones, Juilfs, Garringer and Boesenberg);
Count V: Unconstitutional policy or custom, failure to train, and failure to supervise (City of Cedar Rapids);
Count VI: Ratification of constitutional violations (City of Cedar Rapids);
Count VIII: Assault and battery (Juilfs, Jones, Boesenberg and Garringer);
Count IX: False arrest (Juilfs, Jones, Boesenberg, Garringer and City of Cedar Rapids).
Doc. No. 2.[1] Plaintiffs seek actual and punitive damages on behalf of Gossman's estate *775 and Gossman's surviving family members.
Defendants answered and discovery commenced. Defendants filed the present motion for summary judgment on December 18, 2018. After receiving an extension due to an ongoing discovery dispute, plaintiffs filed their resistance to the motion for summary judgment on January 24, 2019. Portions of plaintiffs' resistance prompted the defense motion to strike, which was filed on February 13, 2019.
III. SUMMARY JUDGMENT STANDARDS
Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, "the substantive law will identify which facts are material." Id. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. Id. "An issue of material fact is genuine if it has a real basis in the record," Hartnagel v. Norman , 953 F.2d 394, 395 (8th Cir. 1992) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," Woods v. DaimlerChrysler Corp. , 409 F.3d 984, 990 (8th Cir. 2005) (quoting Anderson , 477 U.S. at 248, 106 S.Ct. 2505 ). Evidence that only provides "some metaphysical doubt as to the material facts," Matsushita , 475 U.S. at 586, 106 S.Ct. 1348, or evidence that is "merely colorable" or "not significantly probative," Anderson , 477 U.S. at 249-50, 106 S.Ct. 2505, does not make an issue of material fact genuine. Put another way, "[e]vidence, not contentions, avoids summary judgment." Reasonover v. St. Louis Cnty. , 447 F.3d 569, 578 (8th Cir. 2006) (citation omitted). The parties "may not merely point to unsupported self-serving allegations." Anda v. Wickes Furniture Co. , 517 F.3d 526, 531 (8th Cir. 2008).
As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson , 477 U.S. at 249, 106 S.Ct. 2505 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." Hartnagel , 953 F.2d at 395 (citing Celotex , 477 U.S. at 323, 106 S.Ct. 2548 ). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. Mosley v. City of Northwoods , 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine *776 and material as it relates to the substantive law. Id. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. Celotex , 477 U.S. at 322, 106 S.Ct. 2548.
To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. Matsushita , 475 U.S. at 587-88, 106 S.Ct. 1348. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. Id. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." Kammueller v. Loomis, Fargo & Co. , 383 F.3d 779, 784 (8th Cir. 2004) (citing Quick v. Donaldson Co. , 90 F.3d 1372, 1376-77 (8th Cir. 1996) ). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." Quick , 90 F.3d at 1377.
IV. RELEVANT FACTS
Unless otherwise noted, the following facts are undisputed:
A. The Parties
Jonathan Gossman was detained and then shot by members of the Cedar Rapids Police Department (CRPD) on October 20, 2015. Doc. No. 2 at ¶ 14. This lawsuit was brought by Gossman's mother, Twyla McElree, as the administrator of Gossman's estate, and by Mikaela Gossman and her two children as his surviving family. Id. at ¶¶ 1-2.
The City of Cedar Rapids, Iowa, is a municipal corporation under Iowa Code chapter 670. Nathan Juilfs, Lucas Jones, Brandon Boesenberg and Bryson Garringer are police officers employed by the Cedar Rapids Police Department, and each were involved in the altercation between Gossman and the CRPD on October 20, 2015. Id. at ¶¶6, 11-16. Boesenberg and Garringer conducted surveillance on the night in question that led to Gossman's detention. Juilfs was involved in stopping Gossman's vehicle and Jones - a K9 officer partnered with a police dog named Bane - was called to the scene for a narcotics search. Garringer and Jones ultimately shot Gossman, resulting in his death.
B. The Arrest
On October 20, 2015, Boesenberg and Garringer were on duty conducting surveillance of pseudoephedrine purchases[2] in an unmarked police vehicle. Doc. No. 64-5 at 3-4; Doc. No. 64-7 at 3.[3] Sometime before 9:50 p.m., they parked in the Walgreens parking lot at the corner of 16th *777 Avenue and Edgewood Road SW in Cedar Rapids, Iowa.[4] Doc. No. 64-5 at 6-7, 12, 14. They backed into a stall in the Northeast corner of the parking lot so that the front of the vehicle pointed towards the entrance of the Walgreens. Id. at 6-7. The parking lot was illuminated, and the officers were able to see their surroundings.[5] Id. They monitored pseudoephedrine purchases using an iPad connected to the Internet and displaying the National Precursor Log Exchange (NPLEx), a web-based application that tracks sales of methamphetamine precursors. The NPLEx allows officers to monitor, in real-time, all pseudoephedrine purchases at a specified location. Id. at 4, Doc. No. 64-7 at 3. When a pseudoephedrine purchase was attempted, the time, location, and purchaser's driver's license information appeared on the screen, as well as the frequency of the individual's pseudoephedrine purchases and whether any purchase had been blocked. Doc. No. 64-5 at 4.
Earlier that evening, Gossman, Dillon Graf, Annabelle Santos, Jeff Hass, Enrique Gutierrez and Steven Turner[6] met up at Gossman's father's home. Doc. No. 64-2 at 16. Graf and Santos testified that everyone in the group used methamphetamine before they left in Graf's Ford F-150 truck. Id. at 12. Graf described the group traveling to a few different stores to purchase pseudoephedrine,[7] flash lights and zip ties, and to an apartment complex where Gossman showed some "old biker guys" a gun he wanted to sell. Id. at 2-6, 14. Graf states that Gutierrez and Turner offered Gossman, Graf, Santos and Hass $ 50 to purchase the pseudoephedrine for them. Doc. No. 76-3 at 51.[8] Eventually, the group went to the Walgreens where Boesenberg and Garringer were conducting surveillance.
*778 The Ford F-150 truck caught the officers' attention because Turner and Gutierrez were outside of it talking to the occupants and the other members of the group were in and out of the truck. Doc. No. 64-5 at 6. Boesenberg and Garringer recognized Turner and Gutierrez as involved in methamphetamine manufacturing based on previous investigations. Id. at 6-7, 11. Boesenberg believed that Turner had recently been involved in several recent "one-pot" methamphetamine labs.[9] Id. at 6-7.
As Boesenberg and Garringer observed the Ford F-150, Santos and Graf exited the truck and entered the Walgreens. Santos purchased pseudoephedrine at 9:55 p.m., and Boesenberg and Garringer identified Santos as she exited the Walgreens with Graf. Doc. No. 64-5 at 13, Doc. No. 64-7 at 4, Doc. No. 64-19 at 21. At 9:59 p.m., the officers received an alert that Steven Rittger purchased pseudoephedrine at the CVS pharmacy across the street. Doc. No. 64-5 at 13, Doc. No. 64-20 at 8. A moment later, Hass walked to the truck from the parking lot of the CVS pharmacy. Doc. No. 64-5 at 13. Boesenberg testified that he was familiar with Hass due to his involvement in methamphetamine use and dealing prior to this incident. Doc. No. 64-7 at 4. The officers believed that Rittger may have purchased pseudoephedrine on behalf of Hass, although they did not have direct evidence that this had occurred. Boesenberg Recording at 4:54-5:42.[10]
At 10:12 p.m. (17 minutes after the Santos purchase and 13 minutes after the Rittger/Hass purchase), Gossman exited the truck, entered the Walgreens and successfully purchased pseudoephedrine. Doc. No. 64-5 at 15, Doc. No. 64-7 at 5, Doc. No. 64-20 at 2. Boesenberg and Garringer observed this purchase on NPLEx and identified Gossman as the purchaser based on a mugshot from a prior arrest. Doc. No. 64-5 at 15, Doc. No. 64-7 at 5. Meanwhile, Graf was in and out of the truck as he "messed with" something in the back seat and under the truck. Graf testified that he was attempting to fix a "glow light" attached to the underside of the truck (Doc. No. 76-3 at 53), but apparently that fact was not evident to Boesenberg and Garringer.
At some point, Turner and Gutierrez walked away from the Ford F-150 to a Road Ranger gas station, also on 16th Avenue. Doc. No. 64-2 at 14. Garringer and Boesenberg called Officers Christy and Whitaker to observe and follow those two, while Garringer and Boesenberg stayed with the truck. Doc. No. 64-5 at 15, Doc. No. 64-8 at 9. After the final pseudoephedrine purchase, Graf, Santos, Hass and Gossman drove in the truck to the nearby Road Ranger and dropped Hass off before driving away. Doc. No. 64-5 at 20. Christy and Whitaker observed Hass, Gutierrez and Turner speaking briefly before they walked off in different directions. Doc. No. 64-8 at 11-20.
While monitoring all of this, Boesenberg and Garringer developed the belief that the group was purchasing pseudoephedrine *779 to manufacture methamphetamine and that there was possibly a "one-pot" lab in the truck. See generally Boesenberg Recording. They thought that the number of people associated with the Ford F-150 - three of whom were known to be involved in the manufacture of methamphetamine - was suspicious. They believed that the pattern of pseudoephedrine purchases - two to three people in the same vehicle staggering their buys over approximately 20 minutes - was not consistent with legal pseudoephedrine use. Doc. No. 64-5 at 17; Doc. No. 64-7 at 5. They further believed that there could be a one-pot lab in the truck because of the way people were milling about in the truck, getting in and out, as if they were playing musical chairs. Doc. No. 64-5 at 15; Doc. No. 64-7 at 5. They observed the use of a flashlight in the back of the truck (Doc. No. 64-33 at 4), which they considered unusual, and they were not sure why Graf and was "messing around" in and under the truck. Boesenberg Recording. They thought it was suspicious that Gutierrez and Turner walked away empty handed and that the group drove Hass about 100 feet to drop him off at the Road Ranger where Gutierrez and Turner were waiting. Doc. No. 64-29 at 4.
Garringer and Boesenberg asked Juilfs to follow the Ford F-150 as it left the Road Ranger. Doc. No. 64-8 at 18. Garringer and Boesenberg followed Juilfs. Id. at 19. The officers decided to stop the truck based on their suspicion that it contained evidence of methamphetamine manufacturing and/or smurfing. Id. at 20. Juilfs called for a K9 unit with drug training. Id. ; see also Doc. No. 64-3 at 20. Jones responded. Doc. No. 64-9 at 1.
Boesenberg, Garringer and Juilfs pulled the truck over and approached it. Boesenberg approached the driver's side of the vehicle, followed shortly afterwards by Juilfs, while Garringer approached the passengers' side. Doc. No. 64-6 at 6; Doc. No. 64-7 at 7. As they were approaching, Garringer yelled at the occupants of the truck to show their hands because he saw the person in the back seat (Gossman) fiddling with something as if he was trying to conceal it. Doc. No. 64-6 at 6. Garringer obtained Graf's I.D. and then asked him to step out of the truck. Id. at 7. He asked Graf what they had been doing that night and if he had anything illegal on him or any weapons. Id. Graf handed over a knife, a methamphetamine pipe and a prescription bottle from his pocket. Id. at 8. As Garringer patted Graf down, he could hear Juilfs talking to Gossman and asking him to get out of the car. Id.
Meanwhile, Boesenberg asked both Santos and Gossman for their I.D.'s. Boesenberg Recording at 34:33, 34:55. After speaking with Gossman briefly through the truck's rear window, Boesenberg asked Santos to step out of the truck and began questioning her. Id. at 36:36. Initially, she denied purchasing pseudoephedrine and lied about when she joined the group and what they were doing that night. Id. at 38:16-40:15. Then, she admitted purchasing "Wal-Phed" but denied knowing that it had pseudoephedrine in it. Id. She stated that the pseudoephedrine was still in the truck and that she had given it to one of the individuals in the vehicle. Id. at 40:11-40:24. While Boesenberg was questioning Santos, Jones arrived with his K9, Bane. Doc. No. 64-4 at 1-2. Boesenberg asked Jones to stay with Santos as Boesenberg returned to the driver's side of the car. Id., see also Doc. No. 64-2 at 2.
At the same time, Juilfs was asking Gossman for his full name, address and criminal history. Gossman answered some questions, however he refused to provide his full current address. Doc. No. 64-9 at 3. Garringer informed Juilfs that he had discovered a pipe on Graf and Juilfs advised *780 Gossman that he was going to be searched. Id. Juilfs testified that when Gossman was informed that he would be searched, he began reaching his hands to the right side of his waist, prompting Juilfs to instruct Gossman to put his hands where officers could see. Id. Juilfs reached into the truck and removed a knife from a lanyard around Gossman's neck. Id. at 7.
While that was happening, Garringer asked Graf if there was anything dangerous in the car and Graf stated there was a shotgun in the backseat. Doc. No. 64-6 at 8; Doc. No. 64-9 at 3. Garringer relayed that information to Juilfs and Boesenberg. Juilfs asked Gossman to get out of the truck and Gossman refused. Doc. No. 76-3 at 102-03. Garringer recalls hearing Juilfs inform Gossman that he would be removed from the truck, and hearing Gossman yell "No." Doc. No. 64-6 at 9. This prompted Garringer to draw his gun with his right hand. Id.
Boesenberg returned to the driver's side of the truck. He testified that after he heard there was a gun in the truck, his objective was to get Gossman out of the truck and away from the gun. Doc. No. 64-7 at 7. By this point, Boesenberg had also drawn his firearm for safety purposes. Jones intended to have Bane perform a sniff of the truck, which was an additional reason to ask Gossman to get out. Doc. No. 64-26 at 9. Boesenberg tried to open the door but it was locked. Doc. No. 64-7 at 7. Juilfs unlocked the door from the front driver's side door. Id. Boesenberg opened the door, positioned himself inside of the door and told Gossman to get out of the truck and put his hands on his head. Id.
As Gossman stepped out of the truck, Boesenberg initially thought he was complying and tried to holster his weapon so that he could detain and search Gossman. However, once Gossman's feet hit the ground he began moving towards the rear of the truck and past the parked police vehicles (where Jones, Garringer, Bane, Santos and Graf were standing). Id. at 8. Boesenberg tried to wrap his left arm around Gossman to keep him from running away, but his service weapon was in right hand and Boesenberg testified that it was not safe to put his right arm around Gossman while holding the weapon. Id. at 7, 9. Due to the struggle, he was unable to either holster his weapon or control Gossman with one arm. Doc. No. 64-4 at 3; Doc. No. 64-7 at 9-10. At the same time, Jones told Boesenberg to let go because, in his opinion, it would be safer under the circumstances to allow Bane to do a take-down. Doc. No. 64-5 at 5. Boesenberg testified that he did not hear this instruction. However, he let go and Gossman took off running, pursued by Bane, Jones and Garringer. Doc. No. 64-7 at 9-10. Garringer ordered Gossman to stop but Gossman kept running. Doc. No. 64-4 at 8. Boesenberg and Juilfs stayed back with Santos and Graf. They cuffed Santos and Graf, who were eventually placed in separate police cars.
Graf testified that he also witnessed the moments when Gossman came out of the truck and the chase began. Graf stated that "once [Gossman] hit the ground, he broke free and took off running." Doc. No. 64-2 at 18. Graf heard the officers yelling at Gossman to stop. Id. at 20. Graf testified that he was not surprised when Gossman ran, because Gossman had stated that he would run if he was arrested, despite warnings by Graf and others that this would be dangerous. Id. at 19. This testimony was corroborated by a text message exchange between Graf and Mikaela Gossman after the incident. Doc. No. 64-21 at 11.
While Jones and Garringer were pursuing Gossman, they both noticed that Gossman *781 held onto the front of his waistband the entire time he was running. Doc. No. 64-4 at 3; Doc. No. 64-6 at 12. This concerned them because, according to their training, this indicated that Gossman may be armed, particularly in light of the fact that they knew there was a shotgun in the back seat of the truck. Doc. No. 64-4 at 3; Doc. No. 64-6 at 12. As they were chasing Gossman, they kept Bane in front of them to complete a take down as they followed close behind. They both noted that Gossman was not sprinting but was running at a pace faster than a jog. Doc. No. 64-4 at 11; Doc. No. 64-6 at 6.
Gossman ran down the street the distance of approximately three driveways before Bane "caught" him by biting his left elbow.[11] Gossman ran and fell for a few more steps, twisting to the left as he fell down. As Gossman was falling, Garringer saw him twist and draw a firearm from his waistband. Doc. No. 64-6 at 13. Garringer testified that when he saw that, he immediately stopped running, because he did not want to run towards a handgun. Id. at 14. He yelled "gun" or "Jesus, gun." Garringer heard a clap and saw a flash of light and believed Gossman had fired his gun in his direction. As he tried to stop, Garringer slipped and fell onto his left knee or leg and dropped his flashlight. Id. at 14-15. He returned to his feet and began firing. Id. at 16.
Jones heard Garringer yell "gun" and saw him fall towards the ground. He saw Gossman holding the gun and, believing Garringer may have fallen because he was shot, Jones "swung wide" and fired his service weapon at Gossman. Doc. No. 64-4 at 11-12. Jones testified to his reasoning for firing:
The threat presented itself when Mr. Gossman displayed a loaded handgun. So I felt at that point I wanted that threat to end immediately. Because of his resisting with the other officers, because of his running down the sidewalk, he'd already demonstrated to us that he was going to [do] whatever it takes to get away, including fleeing from a police K9. So the fact that he had displayed a loaded handgun, I absolutely wanted to end that threat before something bad happened to an officer.
Id. at 14.
Jones and Garringer stopped firing when they saw that Gossman had slumped over and no longer appeared to be aiming his weapon. Id. at 14, Doc. No. 64-6 at 17. They each asked if the other was ok and then called for an ambulance. Doc. No. 64-6 at 19. Christy approached and removed the firearm and checked Gossman for a pulse. Id. at 20. Gossman was pronounced dead on the scene. The medical examiner's report indicated he was shot 24 times and had sustained additional graze wounds. Doc. No. 64-12 at 1-5. He had methamphetamine in his system. Id. at 5. Examination of Gossman's weapon showed that it was a 9 mm handgun. It was loaded but had not been fired. Doc. No. 64-16 at 5.
C. Other Information
Both parties have submitted information related to the officers' training and CRPD policy that need not be fully summarized here. Plaintiffs have also submitted several documents related to prior suits against the City of Cedar Rapids for excessive use of force, as well as attorney-authored documents. This information will be discussed where relevant below.
V. DISCUSSION
A. Motion to Strike
Defendants have objected to several portions of plaintiffs' statement of material *782 facts (Doc. No. 90-1) for failing to comply with L.R. 56(b)(2)-(3) because it (1) does not correspond with the numbering used by defendants in their statement of material facts,[12] (2) fails to expressly admit, deny or qualify the corresponding numbered facts set forth by defendants,[13] (3) sets forth argument and speculation[14] rather than statements of additional material facts which preclude summary judgment, and (4) is not adequately supported by citations to the records. For the most part, I agree with defendants' description of plaintiffs' statement of material facts. The motion to strike plaintiffs' statement of material facts is granted. As a result, rather than relying on plaintiffs' flawed and improper statement of facts (Doc. No. 90-1) to determine whether there is a disputed fact, I have relied on the record submitted by plaintiffs as well as any inconsistencies between the record evidence submitted by defendants. Thus, in considering the arguments for summary judgment, I will highlight where plaintiffs have submitted record evidence which contradicts a fact asserted by the defendants and explain whether that evidence establishes that a fact is disputed and whether that fact is material to the resolution of the case.
Defendants have also objected to several portions of plaintiffs' appendix as not properly authenticated, not disclosed in discovery, not relevant, and/or pertaining to matters not appropriately addressed in the pending motion. I will consider whether each of the objected-to portions of the appendix should be stricken.
1. Unauthenticated Transcripts
Defendants argue that the documents "Transcript of All Radio Traffic Related to Gossman Surveillance and Death" (Doc. No. 90-14 at 1-7), "Summary of other Audio Files for Exhibits from CRPD Joint Communications 911 Calls" (Id. at 8-19), "Summary of All Radio Traffic Cross-Matched with Audio Related or Unrelated" (plaintiffs' version of the Boesenberg recording transcript, id. at 20-54) should be stricken because they are unauthenticated. Defendants further contend that these transcriptions were not provided to defendants in discovery and that large portions of the transcripts are irrelevant for resolving *783 the present motion for summary judgment.
Plaintiffs do not contest the fact that they did not attach an authenticating affidavit to any of these transcripts within the appendix. Doc. No. 108 at ¶¶ 6-7. Rather, they assert that "the customary manner to authenticate a transcript of an audio is to compare the written document to it." Id. at ¶ 6. Plaintiffs argue that because they have submitted the audio from which the transcripts were generated, the transcripts are sufficiently "authentic" for the court to consider them for the purposes of a summary judgment motion. Doc. No. 108-1. Plaintiffs also argue that defendants' version of the transcript[15] is both inaccurate and inadmissible in evidence at trial. Finally, plaintiffs have filed an affidavit stating that plaintiffs' counsel prepared the transcripts herself in a belated attempt to properly authenticate the document. Doc. No. 108-2 at ¶¶ 1-5. Plaintiffs attempt to excuse the failure to disclose the documents by stating that the audio files from which the transcripts were created were disclosed. They do not respond to defendants' argument that the transcripts are irrelevant.
" Federal Rule of Evidence 901(a) provides that the requirement of authentication is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.' " Jones v. Nat'l Am. Univ. , 608 F.3d 1039, 1045 (8th Cir. 2010) (quoting Fed. R. Evid. 901(a) ). In the summary judgment context, "documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e). Documents that which do not meet these requirements cannot be considered." Stuart v. Gen. Motors Corp. , 217 F.3d 621, 635 n.20 (8th Cir. 2000).
Plaintiffs' transcripts are not properly authenticated under Stuart , and therefore must be stricken. Moreover, the failure to disclose this purported evidence supports my decision to sustain defendants' objection to these documents. Without earlier disclosure, there was no opportunity for defendants to judge the accuracy of these transcripts. Plaintiffs' argument that defendants can do so now by listening to the audio notwithstanding, the failure to disclose evidence intended to be used in this case is inexplicable. Finally, I note that I do not find that any particular portions of plaintiffs' transcripts, even if properly part of the summary judgment record, would affect the outcome of the summary judgment motion. Defendants' motion to strike will be granted as to the unauthenticated transcripts.
2. Documents Authored by Plaintiffs' Counsel
Defendants next object that several documents authored by plaintiffs' counsel, Judith O'Donohoe, must be struck as speculative, irrelevant and argumentative. Simply put, defendants contend these items are not evidence and cannot be used to create a disputed issue of fact in resistance to the summary judgment motion. This objection includes a "Response to Defendant's Chronology at Appendix 1751-1758" (Doc. No. 90-15 at 80-95), two affidavits authored by O'Donohoe (id. at 123-25, 126-28), and a discovery dispute letter sent by *784 O'Donohoe to defense counsel (id. at 130-35).
The document "Response to Defendant's Chronology" was apparently authored by O'Donohoe. However, it is undated, unsigned and unauthenticated by any accompanying documents. It was not disclosed during discovery. It states that "[t]he Gossman chronology, found at Defendants' appendix 1751-1758, is not a factual matter which is not [sic] appropriately placed in an appendix. There is no attribution in the chronology to the source of the information." Id. at 80. It goes on to explain, with citations to both the plaintiff and defense appendices as well as argument, why the Gossman chronology is not competent evidence.
The Gossman chronology (Doc. No. 64-62 at 11-18) itself is also unsigned, undated and unattributed to any particular author, although it is at least clear that it was generated as part of the DCI investigation into Gossman's death. For what it is worth, I have not relied on the Gossman chronology in resolving the present motion. However, filing a competing and argumentative chronology is not the proper way to object to evidence improperly included in a summary judgment appendix. Defendants' motion to strike plaintiffs' response to the Gossman chronology is granted.
The first O'Donohoe affidavit (Doc. No. 90-15 at 123-25) sets out the basis for her opinion that Turner or Gutierrez may have been acting as confidential informants. O'Donohoe states that the defendants have refused to produce evidence related to these two, and that although Garringer and Boesenberg have stated that they were not working with confidential informants on the night in question, this explanation does not make sense based on the timing of certain events. Id. O'Donohoe's opinion as to whether Turner or Gutierrez were confidential informants is not relevant. She does not have personal knowledge regarding the events and her speculation as to the motivations of the officers involved is both inadmissible and insufficient to create a genuine issue of material fact. Defendants' motion to strike the first O'Donohoe affidavit is granted.
The second O'Donohoe affidavit (Doc. No. 90-15 at 126-28) details the K9 training materials and records that were or were not disclosed during discovery. O'Donohoe implies that some materials were improperly withheld. The pending motion for summary judgment is not the appropriate place to resolve that dispute. Rather, plaintiffs should have filed a timely motion to compel or, at least, a motion for leave to file a late motion to compel. As I noted earlier in this case, they did neither.[16] The second affidavit does not contain competent evidence that is relevant for resolving the pending summary judgment motion. Therefore, defendants' motion to strike the second O'Donohoe affidavit is granted.
Finally, O'Donohoe's letter to defense counsel (Doc. No. 90-15 at 130-35), dated December 9, 2019, describes O'Donohoe's attempt to resolve discovery disputes related to officer training and K-9 training. As with the second O'Donohoe affidavit, this letter relates to matters that are not appropriately considered in the context of a motion for summary judgment and does not contain relevant facts related to resolving the pending motion. Defendants' motion *785 to strike the O'Donohoe letter is granted.
3. The Beacon Report
Defendants move to strike the Beacon Report (Doc. No. 90-15 at 96-99) because "neither the investigator nor Beacon ... were ever disclosed at any stage of the litigation as witnesses, parties with knowledge, or experts." Doc. No. 102-1 at 13. As noted earlier, the Beacon Report describes surveillance conducted at the Walgreens location to determine whether hair color, eye color, height, weight and other facial features would be visible from a distance given the conditions on the night in question.
Plaintiffs do not explain why this report was not disclosed prior to the motion for summary judgment, other than to state it was disclosed when it was available and that "[t]he experts' reports are not required to be totally updated per the Magistrate's order until after a ruling on this motion for summary judgment is made." Doc. No. 108 at 4-9. Plaintiffs further explain that this report was provided to their expert, Aaron Westrick, to aid his determination of whether the defendants had probable cause to stop the Ford F-150 based on what they observed in the Walgreen's parking lot.
Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert witnesses. Initial expert disclosures were due from the plaintiffs on May 1, 2018, and Plaintiffs' rebuttal expert disclosure deadline was August 15, 2018. Doc. No. 39. As with all other types of discovery, the parties are under an ongoing duty to supplement expert disclosures under Rule 26(e). Fed. R. Civ. P. 26(a)(2)(E). On September 13, 2018, plaintiffs agreed to supplement discovery of any material provided to plaintiffs' expert witnesses, but no date was specified. Doc. No. 45. Plaintiffs' statement that the expert reports are not yet "required to be totally updated" appears to refer to a scheduling matter discussed during a December 10, 2018, status conference with Judge Mahoney. The minutes include the following statement:
Plaintiffs and defendants agree that defendants need not supplement their expert report (including any training relied upon by the expert in forming his opinion) until after the motion for summary judgment is ruled upon. Any supplemental expert reports (by either side) are due two weeks after the court's issuance of its order on summary judgment.
Doc. No. 56. The operative word in this statement is "supplement." There is no indication that Judge Mahoney granted leave for any party to disclose new experts after the summary judgment order is filed. Instead, she referenced the supplementation of existing expert reports.
In any event, it is not entirely clear whether the Beacon Report constitutes a "new expert report," which would clearly be untimely, or a "supplement" to the body of information provided to plaintiffs' already-disclosed expert in this case.[17] Ultimately, and while I find that the defendants have raised valid concerns, I find that it is unnecessary to strike the report. Unlike the improper materials discussed in Sections V(A)(1) and V(A)(2), above, the Beacon Report is legitimate evidence and does provide some relevant information. While the information in the Beacon Report does not affect the final analysis of the summary judgment motion, I decline *786 to strike it. The defendants' motion to strike is denied as to the Beacon Report.
4. Statement of Jeffrey Hass
Defendants move to strike the statement of Jeffrey Hass (Doc. No. 90-15 at 117-118) on grounds that it is not notarized and that plaintiffs have failed to provide contact information for Hass upon request despite identifying him as a person with knowledge of the events. The argument concerning lack of notarization fails, as the statement substantially complies with the requirements of 28 U.S.C. § 1746 (Unsworn declarations under penalty of perjury).
As for defendants' other concerns, I note that the statement was signed on December 26, 2018, one week after defendants filed their motion for summary judgment. Id. at 117. The affidavit describes the basis for Hass' belief that Turner was working as a confidential informant for law enforcement during the relevant events. Plaintiffs claim they were unable to find Hass until mid-December 2018 and that they disclosed information related to Hass as they obtained it. Although the statement is of limited reliability and relevance, I find no need to strike it. Defendants' motion to strike the Hass statement is denied.
5. Aaron Westrick opinions
Finally, defendants move to strike the expert report (Doc. No. 19-15 at 100-16)[18] of Aaron Westrick, Ph.D., on the basis that it contains inadmissible opinions under Clay v. Woodbury Cnty. , 982 F.Supp.2d 904 (N.D. Iowa 2013). Defendants contend that Westrick's opinions are impermissible because (1) they purport to instruct the jury as to whether the officers' actions met the legal definition of reasonableness and (2) they are based on alleged facts that are not present in the record. I agree that large portions of Westrick's report are inadmissible. However, it is not necessary to strike the report in its entirety.
Westrick is a director of research, executive consultant, professor and law enforcement officer with 35 years of experience. Id. at 115-16. He is published in the field, teaches on the use of force and has served as an expert in several civil and criminal cases. Id. In reaching his opinions, Westrick relied on many of the documents that were submitted with the parties' summary judgment filings. Id. at 115. He opines that (1) the officers had no reasonable suspicion to stop the Ford F-150, given that Turner and Gutierrez had walked away at that point and, in Westrick's opinion, the identification of the other suspects was unreliable; (2) the investigation did not follow basic narcotic investigation practices regarding the use of confidential informants; (3) Juilfs did not exercise proper supervision over the other officers; (4) the officers had, but did not take advantage of, the opportunity to control the situation through the use of de-escalation procedures when Gossman exited the truck; and (5) Gossman's death was the result of recklessness rather than adherence to policy. Id. at 113-16.
As defendants note, however, Westrick bases his opinions on many "facts" that have no basis in the record. Instead, these "facts" are assumptions that Westrick has made in weighing the evidence and judging the credibility of various actors. "[A]n expert may not go so far as to usurp the exclusive function of the jury to *787 weigh the evidence and determine credibility. Nor may an expert pass judgment on a witness' truthfulness in the guise of a professional opinion." Wescott v. Crinklaw , 68 F.3d 1073, 1076 (8th Cir. 1995) ; see also Clay , 982 F.Supp.2d at 917 (expert witness "would not be allowed to opine on a factual matter on which the jurors are entirely capable of making a determination, such as what force was used by the officers, nor would he be allowed to base his opinion on what he believes the correct version of the facts to be." (cleaned up) ).
Westrick's report contains the following impermissible factual determinations:
1. "In the review of the [Boesenberg Audio] it is clear that officers were utilizing an informant(s) during the suspects' transactions and that one of the believed informants (Mr. Turner) instructed Ms. Santos to purchase pseudoephedrine." Doc. No. 90-15 at 110. I have reviewed the Boesenberg audio and the deposition testimony of Officers Garringer and Boesenberg. The only (potentially) admissible evidence to support the statement that the officers were clearly utilizing an informant is the Hass affidavit. Determining that the use of an informant was "clear" is a determination of a factual issue which invades the province of the jury. The repeated references regarding the existence of a confidential informant are stricken.
2. "While surveilling the blue pick-up truck they noted Ms. Santos and Mr. Gossman (who it is believed to be visually impossible to identify) ..." Id. Whether it was possible to identify Gossman is an improper determination of fact which must be stricken.
3. "Mr. Gossman was removed from the vehicle with his hand secure behind his back by Officer Boesenberg." Id. at 111. No witness to the incident testified that Gossman was ever secured with either of his hands behind his back. In fact, every eyewitness testified to the opposite. Further, the statements that Boesenberg had Gossman "from the behind in a 'big ole' bear hug' " around the belt area, and that Jones told Boesenberg to let Gossman go from this position (Id. at 112) is not consistent with any witness's testimony in this case and takes multiple citations from the Garringer and Jones depositions out of context. These statements are also stricken, as they invade the province of the jury by apparently deciding that the officers are not credible. I note that an expert's recitation of facts as to which he does not have personal knowledge does not generate a material disputed fact.
4. "Gossman's 'pointing' of the gun is unlikely given the apparent continuous motion of him being pulled to the ground by the attacking K-9." Id. at 112. This statement is a determination that an eyewitness to the event could form, but as Westrick was not an eyewitness, this factual conclusion must be stricken.
Turning to Westrick's opinions, two opinions must be stricken for invading the province of the court to instruct the jury on the law. Westrick states (1) that there was a lack of reasonable suspicion to stop the Ford F-150 and (2) that the police action on the night in question was "unreasonable." As Judge Bennett explained in Clay , Westrick can testify as to "routine and acceptable" police practices based on his training and expertise, he can "respond to abstract or hypothetical questions by opining" that the police action described "was or was not reasonable in the circumstances described in such a question," and can "opine as to whether he personally believed that" the police action was reasonable, but he cannot opine as to whether police action met the legal standard for reasonableness. 982 F.Supp.2d at 917-18.
*788 In short, defendants' motion to strike Westrick's entire report is denied. However, and as specified above, certain of his factual statements and opinions are stricken.
B. Motion for Summary Judgment
1. Count I - Stop without Probable Cause
Count I alleges that defendants Juilfs, Garringer and Boesenberg violated Gossman's rights under the United States and Iowa Constitutions by stopping the Ford F-150 without probable cause. Defendants contend that they are entitled to summary judgment because the stop of the car was supported by reasonable suspicion and that probable cause was not needed to justify this stop. In the alternative, defendants argue that they are entitled to qualified immunity.
Plaintiffs respond that probable cause was lacking because (1) "Garringer and Boesenberg did not confirm the identities of either Santos or Gossman who was called 'Grossman' or their connection to the car or their actual purchase of a pseudoephedrine product at the pharmacy," (2) the involvement of Turner earlier in the evening was insufficient to provide probable cause and (3) the Ford F-150 was not involved in a traffic violation. Doc. No. 90-2 at 15. The Supreme Court has made it clear that probable cause is not necessary under the Fourth Amendment to stop a vehicle:
The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. Terry v. Ohio , 392 U.S. 1, 9 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968) ; United States v. Cortez , 449 U.S. 411, 417 [101 S.Ct. 690, 66 L.Ed.2d 621] (1981). Because the "balance between the public interest and the individual's right to personal security," United States v. Brignoni-Ponce , 422 U.S. 873, 878 [95 S.Ct. 2574, 45 L.Ed.2d 607] (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot," United States v. Sokolow , 490 U.S. 1, 7 [109 S.Ct. 1581, 104 L.Ed.2d 1] (1989) ; see also Cortez , 449 U.S. at 417 [101 S.Ct. 690] ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.").
United States v. Arvizu , 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citations cleaned up); see also State v. Heminover , 619 N.W.2d 353, 357-58 (Iowa 2000) (under the Iowa Constitution, "an investigatory stop of a vehicle is constitutionally permissible only if the officer who has made the stop has specific and articulable cause to reasonably believe criminal activity is afoot"); State v. Kooima , 833 N.W.2d 202, 206 (Iowa 2013) (citing Sokolow , 490 U.S. 1, 109 S.Ct. 1581, with approval in the context of an investigatory traffic stop).
Because probable cause is not required to initiate a traffic stop, Count I fails to state a claim. Additionally, I find as a matter of law that the stop of the vehicle was supported by reasonable suspicion. Boesenberg and Garringer were monitoring purchases of pseudoephedrine, a known ingredient in the manufacture of methamphetamine. Three people who were known by the officers to be involved in the manufacture of methamphetamine were associated with the Ford truck. There were two - and potentially three - separate pseudoephedrine purchases associated with the truck, spread out across approximately 20 minutes and two pharmacies.
*789 The back-seat passenger was using a flashlight and bent over in the back seat in a manner that suggested to the officers that he could be hiding something under the back seat or perhaps assembling a one-pot device for the purpose of manufacturing methamphetamine. Three of the suspects split off from the group in the truck in a manner the police officers considered suspicious. Based on the totality of the circumstances, the officers had enough information from which to conclude that the occupants were in potential violation of Iowa Code §§ 124.401(3) or 124.401(4)(b). See United States v. Ameling , 328 F.3d 443, 448 (8th Cir. 2003) (analyzing a Terry stop under similar circumstances). Therefore, the stop of the Ford F-150 was constitutionally permitted.
Plaintiffs' arguments to the contrary are either unavailing or irrelevant. Plaintiffs challenge the identification of Santos and Gossman as the two who purchased pseudoephedrine at Walgreens, based on the lighting conditions as reported by Beacon. However, a 100% positive identification is not necessary for reasonable suspicion, Illinois v. Wardlow , 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence"). Moreover, the officers had other information beyond the mere identification of the two suspects from which they could determine that the inhabitants of the truck were the ones who had purchased the pseudoephedrine.
Plaintiffs also argue that once Gutierrez, Turner and Hass - the three known to be involved in methamphetamine manufacture - separated from the Ford F-150, insufficient justification remained to stop the truck. I disagree. The officers had identified Gossman and Santos with reasonable certainty as purchasers of pseudoephedrine and were not required to ignore them simply because other targets had moved away from the scene. Defendants' motion for summary judgment is granted as to Count I.
2. Count II - Seizure of the Vehicle & Gossman without Probable Cause
Count II alleges that Juilfs, Garringer and Boesenberg violated Gossman's rights under the United States and Iowa Constitutions when they seized the truck and its passengers during the course of the investigatory stop. This claim is essentially identical to the claim above.[19] For the same reasons as articulated regarding Count I, defendants are entitled to summary judgment on Count II.
3. Count III - Arrest without Probable Cause
Count III alleges that defendants Juilfs, Garringer and Boesenberg violated Gossman's rights under the United States and Iowa Constitutions by ordering him out of the vehicle and attempting to detain him without probable cause. Defendants argue that they are entitled to summary judgment on this issue because a suspect or passenger may be ordered out of a car and detained during an investigatory stop on the basis of a reasonable suspicion of criminal activity or dangerousness, which the officers had in this case. In the alternative, defendants argue that they are entitled to qualified immunity on Count III. Plaintiffs respond that Gossman had not committed a crime and was therefore not subject to arrest.[20]
*790 During a lawful traffic stop, an officer may order the driver out of the vehicle for officer safety, even if it is not apparent that the driver poses a threat. Pennsylvania v. Mimms , 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) ("The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it ... What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."). Passengers may be ordered out of a vehicle for the purpose of an "investigative detention" if the officer has a "reasonable, articulable suspicion that the person is engaged in criminal activity." United States v. Binion , 570 F.3d 1034, 1039 (8th Cir. 2009) (citing Terry , 392 U.S. at 21, 88 S.Ct. 1868 ; United States v. Long , 320 F.3d 795, 800 (8th Cir. 2003) (investigative detention "can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation.") ); State v. McIver , 858 N.W.2d 699, 702 (Iowa 2015) ("A traffic stop is permissible under our Iowa and Federal Constitutions when supported by probable cause or reasonable suspicion of a crime.... When a peace officer observes any type of traffic offense, the violation establishes both probable cause to stop the vehicle and reasonable suspicion to investigate."). "The officer must have a 'particularized and objective basis for suspecting the particular person stopped of criminal activity' in light of all the circumstances from which 'a trained officer draws inferences and makes deductions ... that might well elude an untrained person' ". Binion , 570 F.3d at 1039 (citing Cortez , 449 U.S. at 417-18, 101 S.Ct. 690 ).
In Binion , the Eighth Circuit considered whether an officer acted within constitutional bounds when she ordered a passenger out of the car during a traffic stop and subjected him to a Terry search because she smelled burnt marijuana and thought the passenger appeared lethargic and nervous. 570 F.3d at 1037-38. The court upheld the officer's actions, concluding that she "had a reasonable suspicion that Binion was involved in criminal activity and was therefore justified in investigating him." Id. at 1039. In Ameling , the Eighth Circuit held that officers had probable cause to detain a vehicle and its passengers in a case similar to this one, as the passengers purchased pseudoephedrine in a manner supporting an inference that they were attempting to hide their purchases and then gave inconsistent answers when questioned separately about their activities. 328 F.3d at 448-49.
As in Binion and Ameling , the officers in this case had at least a reasonable suspicion that criminal activity was afoot so as to justify the continued detention of all three passengers of the car, including Gossman. In addition to what the officers learned before stopping the car, the inconsistent accounts of Graf and Santos provided further reasons to detain the occupants of the Ford F-150 for a Terry search. Further, Gossman was only partially cooperative when he was questioned, refusing to provide his address and refusing *791 to exit the truck until Juilfs unlocked the door and opened it. Based on this information, the officers had sufficient cause to detain Gossman to investigate the possible unlawful purchase or possession of pseudoephedrine. Ameling , 328 F.3d at 448 ("[O]nce a lawful stop has occurred, officers are entitled to conduct an investigation reasonably related in scope to the circumstances which justified the interference in the first place." (citation omitted). Because the officers were constitutionally justified in detaining Gossman, they were justified in pursuing him when he tried to flee.
Plaintiffs' arguments to the contrary are irrelevant or unavailing. They focus on Jones' statement that he intended to arrest Gossman for interference with official acts[21] and argue that Gossman could not have committed such a crime because he had been compliant up until the time that Bane was deployed to stop him.[22] However, the undisputed evidence shows that Bane was released only after Boesenberg was unable to control Gossman as he started to flee. Every eyewitness at the scene indicated that Gossman immediately started to run as he came out of the truck. Taking the facts "in the light most favorable to the non-moving party" does not permit the court to create a material disputed fact out of thin air. Thus, even if the officers were not justified in conducting Terry stop as detailed above, they had probable cause to arrest Gossman for interference with official acts once he resisted and started to run. United States v. Blackmon , 662 F.3d 981, 985-86 (8th Cir. 2011) ("[A] defendant's response to even an invalid arrest or Terry stop may constitute independent grounds for arrest."); State v. Dawdy , 533 N.W.2d 551, 555 (Iowa 1995) (adopting Blackmon ). Summary judgment is granted as to Count III.
4. Count IV - Use of Excessive Force
Count IV alleges that officers Jones and Garringer violated Gossman's right to be free from the excessive use of force under the United States and Iowa Constitutions by shooting him during the pursuit after Gossman ran away from the truck. Defendants argue that they are entitled to summary judgment as to Count IV because they reasonably believed that Gossman posed a threat of serious physical harm when he appeared to draw a firearm from his waistband and point it in the direction of the officers as he fell to the ground. In the alternative, defendants argue that they are entitled to qualified immunity.
In resistance, plaintiffs argue that Gossman "clearly had no intention of harming the officers by virtue of his conduct." Doc.
*792 No. 90-2. Plaintiffs argue that Gossman could not have had the firearm in his right hand because Bane was holding his right arm,[23] and that the officers' actions (such as Garringer returning to his feet rather than firing his weapon from the ground) indicate that they did not have a reasonable fear of Gossman. Id. at 27. Plaintiffs also state, with no basis in the record, that "there is no real argument that Gossman was intentionally pointing his gun at Garringer since it was never pointed outward from his body. At most, it was draped across his chest." Id. at 32. Finally, plaintiffs argue that there is a disputed issue of material fact as to whether Gossman actually drew the gun from his waistband, as his pants fell down while he was falling to the ground.
The Eighth Circuit has described the standard for evaluating an excessive force claim under the U.S. Constitution:
To establish this alleged constitutional violation, the plaintiffs must show that the amount of force [the defendant] used was not reasonable under the circumstances. See Graham v. Connor , 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." Loch [v. City of Litchfield ], 689 F.3d [961,] 965 [ (8th Cir. 2012) ]. "Before employing deadly force, an officer should give some warning when it is feasible to do so." Id. at 967 (quoting [Tennessee v. ] Garner , 471 U.S. [1] at 11-12, 105 S.Ct. 1694 [85 L.Ed.2d 1 (1985) ] ).
We evaluate the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham , 490 U.S. at 396, 109 S.Ct. 1865. This calculus recognizes that officers must make split-second judgments regarding the amount of force necessary in a particular situation and that the circumstances surrounding those judgments can be "tense, uncertain, and rapidly evolving." Id. at 397, 109 S.Ct. 1865. Nevertheless, "the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id.
Dooley v. Tharp , 856 F.3d 1177, 1182 (8th Cir. 2017) (citations cleaned up).[24] "Circumstances *793 relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " Howard v. Kansas City Police Dept. , 570 F.3d 984, 989 (8th Cir. 2009) (quoting Graham , 490 U.S. at 396, 109 S.Ct. 1865 ). The court may also consider "the extent of the suspect's injuries" and "standard police procedures." Mann v. Yarnell , 497 F.3d 822, 826 (8th Cir. 2007) (citations omitted).
In this case, as noted above, the officers had reasonable suspicion to detain Gossman for investigation. Gossman had a knife on a lanyard around his neck. Graf surrendered a similar knife while he was being questioned and informed officers that there was a shotgun in the back seat of the car. Gossman was ordered out of the vehicle with his hands on his head to move him away from the shotgun and to continue the constitutionally justified investigation. He refused. After Juilfs unlocked and opened the door, Gossman did not simply exit as instructed but took off running from the truck with his hands at his waistband. Both Garringer and Jones testified that this concerned them because weapons are commonly worn in waistbands. As the officers pursued Gossman, he kept his hands at his waistband even though he was running. Finally, as Bane latched onto Gossman and he began to fall, Garringer saw the firearm emerge from Gossman's waistband and point in Garringer's direction. Garringer heard and saw what he thought was a gunshot, fell to his knee, and yelled "gun." Jones saw Garringer fall and believed Garringer had been shot. The officers began to fire at that point until - as they testified - they could perceive that the threat had ended.
Under these circumstances, it was objectively reasonable for Garringer and Jones to believe that Gossman posed a serious threat to their safety. Although the crimes for which Gossman was being investigated were relatively minor, he was actively fleeing and attempting to evade police, the officers had been advised that a firearm had been present near Gossman in the truck, Gossman was running while keeping his hands near his waistband and he appeared to pull a firearm as Bane took him to the ground. Garringer and Jones testified that they were acting in compliance with their training by shooting at someone who appeared to be aiming a gun at them. Although they did not warn Gossman before they shot him, they had previously yelled at him to stop running. Once officers perceived a gunshot from Gossman's firearm, it was not unreasonable to shoot without further warning. There is no question that Gossman knew they were police officers and that he was not free to leave the scene.
Plaintiffs' arguments that the police action was unreasonable constitute an attempt to view the scene "with the 20/20 vision of hindsight." Plaintiffs argue that Gossman did not draw his gun, but rather the gun slipped out of his waistband as his jeans fell while he was falling. This hypothesis could be true, but it is ultimately irrelevant in light of the officers' consistent testimony that they saw a firearm in hand and believed it had been fired. Plaintiffs further focus on the fact that Gossman never actually fired his gun, diminishing the threat to the officers. Again, the issue is not whether the officers accurately perceived the events as they unfolded, but *794 whether their perception was reasonable. In this case, for the reasons discussed above, it was. Under these circumstances, considering the facts that the officers were aware of and what they could reasonably perceive, the officers are entitled to summary judgment on Count IV.
5. Count V - Unconstitutional Policy, Failure to Train, Failure to Supervise, and Count VI - Ratification
Counts V and VI asserts constitutional claims against the City of Cedar Rapids for maintaining an unconstitutional policy or custom authorizing its employees to violate Gossman's constitutional rights, for failing to train the officers involved in Gossman's arrest, and for ratifying its employees' allegedly unconstitutional actions by failing to investigate and remedy the alleged violations. Each of these claims fails as a matter of law because there was no underlying constitutional violation. "Without a constitutional violation by the individual officers, there can be no § 1983 or Monell ... municipal liability." Hayek v. City of St. Paul , 488 F.3d 1049, 1055 (8th Cir. 2007) (citations omitted). Defendants are entitled to summary judgment on Counts V and VI.
6. Count VIII - Assault and Battery
Count VIII alleges that defendants Juilfs, Jones, Boesenberg and Garringer are liable for assault and battery against Gossman under Iowa law. My findings as to Counts I through V control the outcome of Count VIII.
Iowa Code § 804.8 states:
A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.
Under § 804.8, "an assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances." Johnson , 352 N.W.2d at 257. As noted above, § 804.8 establishes an "objective reasonableness" standard for the use of force by arresting officers. Chelf , 515 N.W.2d at 355-56 (citing Graham , 490 U.S. at 396-97, 109 S.Ct. 1865 ). Under Iowa law, my finding that defendants' use of force was objectively reasonable requires the entry of summary judgment for the defendants on Count VIII. See Dooley , 856 F.3d at 1184 ; Lawyer v. City of Council Bluffs , 240 F.Supp.2d 941, 953 (S.D. Iowa 2002).
7. Count IX - False Arrest
Count IX alleges that defendants Juilfs, Jones, Boesenberg, Garringer and the City of Cedar Rapids are liable to Gossman under a theory of false arrest. My findings as to Counts I through IV control the outcome of Count IX.
Under Iowa law, the claim for false arrest "has two elements: (1) detention or restraint against one's will, and (2) unlawfulness of the detention or restraint." Thomas v. Marion Cty. , 652 N.W.2d 183, 186 (Iowa 2002) (citations omitted). As discussed above, the (attempted) detention and arrest of Gossman was lawful. It was supported at first by reasonable suspicion that Gossman was committing a crime related to the unlawful possession of pseudoephedrine, and later by probable cause that Gossman was committing the crime of interference with official acts. Defendants are entitled to summary judgment on Count IX.
VI. CONCLUSION
For the reasons set forth herein:
1. Defendants' motion (Doc. No. 102) to strike portions of plaintiffs' resistance *795 is granted in part and denied in part , as follows:
a. The motion to strike is granted as to the following documents:
i. Plaintiffs' reply to defendants' statement of material facts and statement of additional disputed material facts (Doc. No. 90-1);
ii. Three unauthenticated transcripts (Doc. No. 90-14 at 1-54);
iii. Four documents authored by plaintiffs' counsel (Doc. No. 90-15 at 80-95, 123-35).
These documents are stricken from the summary judgment record and were not considered in resolving the motion for summary judgment.
b. The motion to strike is granted in part as to the expert report of Aaron Westrick (Doc. No. 19-15 at 100-16), as described in detail above.
c. The motion to strike is denied as to the following documents:
i. The Beacon Report (Doc. No. 90-15 at 96-99),
ii. The statement of Jeffrey Hass (Doc. No. 90-15 at 117-18)
2. Defendants' motion (Doc. No. 63) for summary judgment is granted as to all claims.
3. Because this order disposes of all claims, judgment shall enter against plaintiff and in favor of the defendants and the Clerk of Court shall close this case .
IT IS SO ORDERED.

The petition initially named additional individual defendants and five John Doe defendants. These defendants were dismissed by joint stipulation on December 17, 2018. Doc. No. 60. Further, plaintiffs agree that Count VII - a claim for state law negligence against Juilfs, Jones, Boesenberg and Garringer - should be dismissed because Iowa law does not recognize a cause of action for negligent investigation of a crime or negligent violation constitutional rights. Doc. No. 90-2 at 44. Summary judgment is granted as to Count VII.

Pseudoephedrine is commonly used to manufacture methamphetamine. Although purchasing pseudoephedrine for FDA-approved uses is legal, its purchase is limited by law to prevent its use in methamphetamine manufacturing. Iowa Code § 124.213. Purchasing pseudoephedrine to manufacture methamphetamine or to sell it to methamphetamine manufacturers (smurfing) is illegal under Iowa law. Iowa Code § 124.401(3) (it is unlawful to sell pseudoephedrine "if the persons knows ... that the product may be used as a precursor to any illegal substance."); Iowa Code § 124.401(4)(b) (it is unlawful to possess pseudoephedrine "with the intent that the product be used to manufacture any controlled substance.").

As proof that there are no material disputed facts surrounding the events of October 20, 2015, defendants have submitted the defendants' depositions, police reports, and Division of Criminal Investigation (DCI) interviews. For the most part, I cite only to the officer's depositions. However, I have reviewed all these documents and find them to be internally consistent.

Although it is not strictly relevant, plaintiffs raise as an issue the question of why the officers chose this particular Walgreens. In an affidavit, plaintiffs' attorney O'Donohoe states that Garringer and Boesenberg explained that "they just happen[ed] to be driving through the Walgreens parking lot and saw a truck parked at a somewhat remote distance from the door of the Walgreens and felt that since there were closer parking spots, this was suspicious." Doc. No. 90-15 at 124. This is a mischaracterization of Boesenberg's and Garringer's testimony, as both stated that they chose this location because it was adjacent to two pharmacies and a gas station. Doc. No. 64-5 at 4. In any event, it seems rather obvious that plaintiffs cannot create a disputed issue of fact with testimony or opinion from their own counsel.

Plaintiffs have submitted a report by Beacon Investigative Solutions (Beacon) regarding this point. On January 13, 2019, at 10:00 p.m., Beacon employees parked in the Walgreens parking lot in the approximate location where Boesenberg and Garringer were parked to "get further information about the visibility from the officer's surveillance location" and determine "the ability to identify hair color, eye color, height, weight and other facial features" from the distance described by the officers. Doc. No. 90-15 at 96. The report concluded that all features except for facial features could be discerned from where the officers were parked. Id. at 97.

Plaintiffs assert that Turner was working as a confidential informant (CI) for the police. In support, plaintiffs have offered two affidavits by plaintiffs' counsel Judith O'Donohoe (Doc. No. 90-15 at 123-28), an affidavit by Hass (Id. at 117-18), and correspondence from O'Donohoe to defense counsel. Id. at 130-35. I will discuss the admissibility and relevance of the evidence in support of this theory in greater detail below.

The NPLEx purchase logs indicate that Graf successfully purchased pseudoephedrine before the group arrived at the 16th Avenue Walgreens. Doc. No. 64-19 at 10.

Plaintiffs' appendix was filed as attachments to Doc. No. 90. However, a portion of plaintiffs' appendix appears to have been omitted in error (pages 89-207). These pages were previously filed (incorrectly) at Doc. No. 76-3 and, therefore, are part of the record.

A "one-pot" methamphetamine lab is a method of manufacturing methamphetamine that involves pseudoephedrine pills and several other common items that can be purchased at pharmacies, gas stations and grocery stores. Doc. No. 64-4 at 20, Doc. No. 64-5 at 1-2.

Both parties submitted the recording electronically, along with purported transcripts of the recording. Doc. No. 64-33 at 3-31 (defendants' transcript); Doc. No. 90-14 at 20-54 (plaintiffs' transcript). Both parties contest the accuracy of the other's transcriptions, which contain minor differences (i.e., using difficult articles or punctuation). I am relying on the audio itself rather than either transcript.

Both officers testified that Bane was holding onto Gossman's elbow. The coroner's report indicates bite wounds on the right wrist. Doc. No. 64-12 at 41.

For example, in ¶ 1, plaintiffs state that they "agree with 1, 2 and 3" of defendants' statement of material facts. Local Rule 56 provides that the resisting party must file "[a] response to the statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact," and a separate "statement of additional material facts that the resisting party contends precludes summary judgment." N.D. Ia. L.R. 56(b)(2) and (3). The rule further provides that "[e]ach individual statement of additional material fact must be concise, numbered separately, and supported by references."Id. at 56(b). Plaintiffs appear to have combined these two documents into one, making it difficult to discern which facts are admitted, denied, qualified or are new facts not previously identified by defendants. Plaintiffs offer no excuse for failing to comply with the local rules.

For example, in ¶ 2 of plaintiffs' statement purports to respond to ¶ 4 of defendants' statement. But it does not contain the words "admit," "deny," or "qualify." Rather, it launches into a string of additional information. This clearly violates the applicable local rule.

For example, ¶ 55 includes the statement "[I]t does not make sense that Boesenberg was very casual about his handling of Santos and Gossman if they had already been concerned about alleged 'furtive movements.' " This statement is not supported by any cite to the appendix and is plainly a statement of opinion or argument rather than a statement of fact.

Unlike the plaintiffs' version of the transcript, the defendants' version was authenticated by an affidavit which stated how it was transcribed (by an attorney in defendants' counsel's office) and checked for accuracy by various named defendants. Doc. No. 64-62 at 29-30.

O'Donohoe has filed motions to extend deadlines related to discovery but has not filed a late motion to compel stating good cause for the filing as permitted under Local Rule 7(c). See Doc. No. 67 at 3 (addressing plaintiffs' motion to extend deadlines and stating "[a]s of the filing of Plaintiffs' motion, it is still not clear whether a motion to compel is warranted.").

Plaintiffs' haphazard arguments in resistance to the motion to strike do not aid me in answering this question.

Plaintiffs have submitted three versions of Westrick's report. It is unclear what providing three drafts of the report is intended to accomplish. The first two drafts are stricken as irrelevant. I will consider only the third draft, which was authored on January 23, 2019.

Plaintiffs agree. Doc. No. 90-2 at 20.

Plaintiffs' argument on Count III starts at the point when Gossman "walked" away from the officers and ignores much of what happened before that point. For example, plaintiffs state that "[i] was clear ... that [Gossman] was not free to leave the vehicle, in the minds of the officers, because when he tried to do so, they pursued him and killed him." Doc. No. 90-2 at 20-21. The undisputed record evidence shows that Gossman was ordered out of the truck, initially refused to comply and then immediately took off running after exiting the vehicle.

Iowa Code § 719.1(1) makes it unlawful to "knowingly resist[ ] or obstruct[ ] anyone known by the person to be a peace officer ... in the performance of any act which is within the scope of the lawful duty or authority of that officer." The fact that an arrest may be unlawful does not justify resisting arrest under the law. State v. Thomas , 262 N.W.2d 607, 611 (Iowa 1978) ("a person may not resist an arrest reasonably effected by one whom the arrestee knows or has good reason to know is a peace officer, despite legality or illegality of the arrest."); see also Iowa Code 804.12 ("A person is not authorized to use force to resist an arrest ... which the person knows is being made either by a peace officer ... even if the person believes that the arrest is unlawful or the arrest is in fact unlawful.").

Plaintiffs also assume that police officers were acting "purely related to assuring their safety" and that their commands were "not directed at having him detained for any offense." Doc. No. 90-2 at 21. They state that "[i]f there was no valid reason to detain Gossman, then the fact that he did not hang around the truck after exiting it should not be considered interference with an official act." Again, this argument has no support in the record because - as discussed above - the officers had a valid reason to detain Gossman.

All eyewitnesses testified to the opposite - that Bane latched on to Gossman's left arm and that the firearm was in Gossman's right hand. In support of their position that the officers were mistaken, plaintiffs cite to the forensic report, which indicates apparent bite marks on the right arm rather than the left. However, even if the officers were mistaken as to which arm Bane utilized, the issue is not whether they were able to perfectly perceive and recall the rapidly developing events, but rather whether they reasonably perceived a threat.

The standard for a violation of the right to be free from excessive force under the Iowa Constitution does not appear to differ from the federal standard. As this court has explained: "Over thirty years ago, the Iowa Supreme Court concluded that, in light of [Iowa Code § 804.8 ], 'an assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances.' " Church v. Anderson , 249 F.Supp.3d 963, 979 (N.D. Iowa 2017) (quoting Johnson v. Civil Serv. Comm'n , 352 N.W.2d 252, 257 (Iowa 1984) ). Ten years after Johnson , the Iowa Court of Appeals found that § 804.8 establishes an objective reasonableness standard for the use of force by arresting officers, finding support in the United States Supreme Court's qualified immunity standard for excessive force claims. Chelf v. Civil Serv. Comm'n , 515 N.W.2d 353, 355-56 (Iowa Ct. App. 1994) (citing Graham v. Connor , 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ).